IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CMFG LIFE INSURANCE COMPANY,
CUMIS INSURANCE SOCIETY, INC., and
MEMBERS LIFE INSURANCE COMPANY,

|  |  |  |
|---|---|---|
| | Plaintiffs, | OPINION AND ORDER |
| v. | | |
| | | 12-cv-037-wmc |
| RBS SECURITIES INC., | | |
| | Defendant. | |

---

In this diversity action, which was originally filed in Wisconsin state court and removed to this court, CMFG Life Insurance Company and its subsidiaries (collectively, "CUNA Mutual") seek to rescind the purchase of fifteen residential mortgage-backed securities certificates sold by RBS Securities Inc. or to recover damages under a theory of unjust enrichment. CUNA Mutual alleges that it bought the certificates on the strength of misrepresentations by RBS about (1) the economic health of these securitized mortgages, (2) the underwriting procedures used by the mortgage loan originators, and (3) the securities' credit ratings. Chiefly before the court is RBS's motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint for failure to state a claim. The court will grant this motion with respect to the unjust enrichment claim, but deny it with respect to the rescission claim, while narrowing as a matter of law the scope of that claim. Recognizing that both the claim for rescission and the claim for unjust enrichment

sound in Wisconsin's principles of equity, the court will also reject CUNA Mutual's demand for a jury trial.[1]

## BACKGROUND

### A. Record

The court accepts as true all well-pleaded facts and allegations in the First Amended Complaint ("Complaint" or "Am. Compl."), drawing all reasonable inferences in favor of the plaintiffs. *London v. RBS Citizens, N.A.*, 600 F.3d 742, 745 (7th Cir. 2010); *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006). Pursuant to RBS's unopposed motion, the court will also consider the prospectuses and prospectus supplements for the disputed securities, as well as CUNA Mutual's 2004 and 2005 annual reports. (Dkt. #34.)

The securities prospectuses and supplements, having been repeatedly referenced and relied upon in the complaint, can be considered part of CUNA Mutual's Complaint. See *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) (holding that courts may consider documents referred to in the complaint, even if not attached to it, provided they are conceded to be authentic and central to the plaintiff's claim). The annual reports published by CUNA Mutual would not normally be considered part of the complaint, but Rule 201(b)(2) permits a fact to be judicially noticed even at the pleading stage if it "can be accurately and readily determined from sources whose accuracy cannot

---

[1] The parties have filed several additional motions: two separate motions for discovery sanctions, a request for leave to amend the complaint, a request for an order requiring an immediate answer to the complaint, and a motion to strike an expert's testimony. The court takes up each of those motions in this opinion as well.

reasonably be questioned."  Under this standard, and particularly in light of the lack of objection by CUNA Mutual, the court can (and does) take judicial notice of the fact that CUNA Mutual Group published these reports in the ordinary course of business.[2]

## B.  Facts

RBS is a Delaware corporation with its principal place of business in Connecticut. All of the CUNA Mutual plaintiffs were incorporated in Iowa and maintain their principal places of business in Wisconsin.

Between 2004 and 2007, CUNA Mutual purchased from RBS fifteen certificates representing the right to receive income from ten separate, residential mortgaged-backed securities.  RBS presented interested buyers, including CUNA Mutual, with a prospectus, prospectus supplement, term sheet, and other "offering documents" summarizing the characteristics of the securitized mortgage loans and describing the underwriting procedures used by third-party, loan originators.

Specifically, the offering documents disclosed:

(1) The percentage of mortgages in the pool secured by the borrower's primary residence (the "owner-occupancy rate").  This number is an indicator of the likelihood the loan will be repaid because it is harder to walk away from a

---

[2] The court does not necessarily take judicial notice of the truth and accuracy of all facts and figures listed within the reports.  Unlike stock prices, *Pugh v. Tribune Co.*, 521 F.3d 686, 691 (7th Cir. 2008), the mere fact that this information is "in the public record" is not a sign that it indisputably true, particularly when the reports themselves warn that the figures reported are "unaudited."  (*See, e.g.*, 2004 CUNA Mutual Group Annual Report, dkt. #35-2, p. 7.)   Even so, they may ultimately be deemed admissible statements by the CUNA Mutual plaintiffs if offered by defendant pursuant to Fed. R. Civ. P. 801(d)(2).

mortgage on one's home than a mortgage on an investment or vacation property.

(2)  The amount loaned compared to the value of the property serving as collateral (the loan-to-value "LTV" ratio) or, in some cases, the amount of all loans secured by the collateral property, including third-party liens, compared to the value of the collateral (the combined loan-to-value "CLTV" ratio).  These ratios are key indicators of the default risk for the loan and the amount of recovery possible in the event of a default.

(3)  A credit rating for each certificate issued by at least one of the three major credit ratings agencies (Standard & Poor's, Moody's and Fitch).  The agencies calculated their ratings in part based on data about the underlying collateral provided to them by RBS, including LTV and CLTV ratios and owner-occupancy percentages.  At the time sold, the fifteen certificates purchased by CUNA Mutual were all rated between "A+" and "BBB-," indicating "investment grade" risk.

(4)  The underwriting guidelines adhered to by the loan originators who approved the mortgages.  Underwriting guidelines refer to the combination of borrower income, debt, credit history, and other pertinent information a lender will consider in determining the likelihood of successful repayment of the loan and in setting limits on the size of the loan to a particular borrower.

In addition to considering the information contained in these offering documents, CUNA Mutual followed up with RBS by phone or email with further inquiries about the

4

quality of the underlying loans securing the debt represented by each certificate (loan pools) and about the loan origination procedures for the collateral backing them.   In those conversations, RBS represented to CUNA Mutual that, as part of its own due diligence efforts, it had "re-underwritten" a representative sample of the mortages to ensure that they were in compliance with the originators' stated underwriting guidelines and to confirm that the advertised characteristics of the loans, such as the LTV ratio and owner-occupancy status, were accurate.

Around the same time that CUNA Mutual purchased the securities certificates, the national real estate market began to decline and there was an ensuing collapse in the value of mortgage-backed securities.   All ten securities performed poorly and the fifteen certificates have since lost much of their value.[3]   The majority of the certificates also lost their "investment grade" status with several falling to "junk-bond" status.

In response to the national real estate collapse, mass defaults by mortgage holders, and corresponding catastrophic losses suffered by investors, various governmental offices and national media bodies investigated the underwriting practices of some of the major mortgage loan originating banks.   Concurrently, CUNA Mutual undertook its own independent research to determine if the offering documents provided by RBS accurately described the securitized mortgage loans and the underwriting used when the certificates were issued.   CUNA Mutual alleges that these public investigations and its own research together show that several categories of information provided by RBS were inaccurate or

---

[3]  A few of the purchases were made on the "secondary market," meaning that they were purchased after the securities officially issued.  These certificates had already lost some of their face value when CUNA Mutual purchased them.

misleading at the time they were made.   CUNA Mutual further alleges that these misrepresentations caused it to have an unrealistically favorable understanding of the credit-worthiness of the securities certificates and to purchase them when it otherwise would not have done so.

OPINION

## I.  Motion to dismiss

The background facts of this case are familiar to even casual observers of the United States economy over the past six years.   There is also a substantial body of caselaw that addresses investors' claims of misrepresentation against mortgage-backed securities underwriters and brokers following the collapse of the housing market in 2007. What distinguishes this case from most is that CUNA Mutual seeks relief in the form of common law contract rescission and unjust enrichment, rather than under the statutory civil liability provisions (§§ 11 and 12) of the Securities Act of 1933, 15 U.S.C. § 77a *et seq*, or the fraud provisions of the Wisconsin Uniform Securities Law, Wis. Stats. Ch. 551.   In response, RBS moves to dismiss some or all of CUNA Mutual's claims on three grounds:   (1) the claims are time barred; (2) CUNA Mutual's rescission claim that RBS made misrepresentations upon which CUNA Mutual justifiably relied is not plausible; and (3) CUNA Mutual's unjust enrichment claim fails as a matter of law on the facts alleged.

To survive a motion to dismiss, a complaint "must plead factual content that allows the court to draw a reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S. Ct. 1937, 1949 (2009). Dismissal is proper pursuant to Rule 12(b)(6) "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).[4]  Plaintiffs need not provide detailed factual allegations, but must provide "enough facts to raise [their claim] above the level of mere speculation." *Riley v. Vilsack*, 665 F. Supp. 2d 994, 997 (W.D. Wis. 2009).

## A. Statute of limitations

RBS first seeks to dismiss CUNA Mutual's claims as to some or all of the fifteen security certificates purchased on grounds that they fall outside the applicable statute of limitations.  The parties agree that Wisconsin's six-year statute of limitations for fraud applies here.  *See* Wis. Stat. § 893.93(1)(b).  An action for relief on grounds of fraud begins running when the plaintiff is on notice of the facts constituting the alleged misrepresentation.  *Id.*  Actual and complete knowledge of the misrepresentation is not necessary in order to begin the running of the limitation period.  *Koehler v. Haechler*, 27 Wis. 2d 275, 278, 133 N.W.2d 730, 731 (Wis. 1965).  Instead, a claim accrues when the plaintiff "finds out enough to cause a reasonable man to make sufficient inquiries to discover the fraud." *Owen v. Wangerin*, 985 F.2d 312, 315 (7th Cir. 1993).

---

[4]  RBS does not rely upon the heightened pleading standards imposed by Federal Rule of Civil Procedure 9(b) for allegations of fraud or mistake and, by its silence, can be deemed to have waived the point.  This may be because the alleged misrepresentation seems to fit neatly into neither the "fraud" category nor the "mistake" category, but the principles underlying Rule 9(b) would seem to support application of the Rule in this case.  *See generally* Ni Qian, Comment, *Heightened Pleading Standard Should Be Applied in Negligent Misrepresentation Cases*, Colum. Bus. L. Rev. Online, *available at* http://cblr.columbia.edu/archives/12443 (last visited August 15, 2013).

Six of these certificates undoubtedly satisfy the limitations period, having been purchased by CUNA Mutual after December 14, 2005, less than six years before the date this suit was filed in state court.  Of the remaining nine certificates, one was purchased 21 months, two were purchased 13 months and six were purchased less than two months before the limitations cutoff date.  (Am. Compl., dkt. #29, Table 2.)  By suggesting that claims of misrepresentation fall outside the six year statute of limitations for each of these certificates, RBS is essentially saying that CUNA Mutual knew or should have known enough about the alleged misrepresentations at the time of purchase, or within a few months of purchase of the securities.

RBS relies heavily on CUNA Mutual's allegation that default losses "spiked almost immediately after issuance," but this does not by itself allow the court to conclude as a matter of law that CUNA Mutual should have or even could have sued at that time.  As an initial matter, the court would not be giving CUNA Mutual, as the non-moving party, the benefit of all reasonable inferences were it to infer from the complaint a total absence of lag time between the securities' performance in any given month and CUNA Mutual's awareness (or constructive notice) of the same performance.  Even if it were, CUNA Mutual alleges, at most, that mortgage default rates spiked and the certificates lost considerable value soon after they were purchased, not that it had actual or even constructive knowledge of the likely, long-term losses because of undisclosed weaknesses specific to the underlying loans securing its recently-purchased certificates.  Most importantly, it is one thing to know that the securities were not making their expected returns, or had even lost long term value in the eyes of investors, and quite another

8

entirely to have cause to suspect that RBS had materially misrepresented the characteristics of the collateralized loans and its own due diligence.

A period of poor performance by itself may reflect any number of unrelated economic or market factors, and is not necessarily sufficient to put investors on notice of *systematic* disregard of underwriting procedures, inflation of underwriting data or the seller's material misrepresentations.  *See, e.g., In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650, 664-65 (S.D.N.Y. 2011) ("In light of the maintenance of investment-grade ratings on the . . . Trust well into the [] limitation period notwithstanding rising delinquency rates and attention to the integrity of the subprime market, the cited delinquency rates and ratings changes are insufficient to warrant dismissal of [the] claim as untimely as a matter of law.").  *Accord Nat'l Credit Union Administration Board v. RBS Securities, Inc.*, Nos. 11-2340-RDR & 11-2649 RDR, 2012 WL 3028803 (D. Kan. July 25, 2012).

Finally, even if CUNA Mutual did suspect in December of 2005 that the securitized loans were not as advertised, it did not then have enough information to launch a plausible lawsuit.  The sources that CUNA Mutual now relies upon for its specific allegations of misrepresentation against RBS and the loan originators -- comprising mainly of interviews or articles published between 2006 and 2012 (*see* Am. Compl. at ¶¶132-281), and of 2005 tax records and real estate market data that likely

would not have been available until 2006 at the earliest (*id.* at ¶¶ 60, 81) -- simply was not available in 2005.[5]

## B. Contract rescission claim

Under Wisconsin principles of equity, a party induced to enter into a contract by the other party's misrepresentation may unilaterally rescind the contract if three essential elements are shown: (1) a misrepresentation of fact; (2) that was material or fraudulent; (3) upon which the recipient justifiably relied. *First Nat. Bank and Trust Co. of Racine v. Notte*, 97 Wis. 2d 207, 222, 293 N.W.2d 530, 538 (Wis. 1980); *Whipp v. Iverson*, 43 Wis. 2d 166, 168, 171, 168 N.W.2d 201, 202, 204 (Wis. 1969).   The Wisconsin Supreme Court deemed this arguably generous, equitable standard (or at least compared to ordinary contract law) to be appropriate because "[i]t would be unjust to allow one who has made false representations, even innocently, to retain the fruits of a bargain induced by such representation."   *Whipp*, 43 Wis. 2d at 171, 168 N.W.2d at 204 (quoting 5 S. Williston, A Treatise on the Law of Contracts, § 1500 (rev. ed. 1937)).[6]

---

[5] Of course, this ruling simply gives CUNA Mutual the benefit of reasonable inferences on the record before the court on a motion to dismiss.  RBS is free to establish that the facts are otherwise at summary judgment or trial.

[6] When a misrepresentation is made by a *third party*, the Wisconsin Supreme Court has found equitable rescission is also allowed under the same, three-pronged test, *unless* "the other party to the transaction in good faith and without reason to know of the misrepresentation either gives value or relies materially on the transaction."  Restatement (Second) Contracts § 164(2); *Notte*, 97 Wis. 2d at 222 (citing § 306(1) (Tent. Draft No. 11, 1976), the precursor to Restatement (Second) of Contracts § 164).  Although it is certainly possible to infer misrepresentations by third parties (loan originators, appraisers and home owners) from the allegations, and CUNA Mutual suggests that this may be a basis for relief in its brief in opposition (dkt. #46 at 19-21), there is no corresponding

###### i.   Misrepresentations of fact

A factual misrepresentation "is an assertion that does not accord with facts as they exist."  *Notte*, 97 Wis. 2d at 222.  CUNA Mutual's request for relief asserts that RBS misrepresented four types of information about the securities: (1) the owner-occupancy statistics for the securitized mortgages; (2) the "loan-to-value" ratios for the securitized mortgages; (3) the security certificates' credit ratings; and (4) the underwriting procedures followed by the loan originators who approved the mortgage loans.[7]

###### a.   Owner-occupancy data

The Complaint appears to support CUNA Mutual's contention that the data provided in the offering documents by RBS misrepresented owner occupancy rates of the subject mortgages.  RBS insists that this contention is directly contradicted by explicit disclaimers of responsibility for all loan-related statistics included in the pages of the prospectuses and prospectus supplements, which informed readers that statistics merely reflected the representations of mortgage loan applicants.  A cursory review of the offering documents fails to support RBS's blanket characterization of the comprehensive nature of these disclaimers, as each set of documents is worded differently and the so-called "disclaiming language" runs the gamut from barely-there to fairly strong.

---

claim for relief on this ground in the complaint and the facts pleaded are insufficiently-developed to survive on this alternative basis alone.

[7]  CUNA Mutual also alleges near the end of its Complaint that RBS falsely represented that it had "reunderwritten" the loans but (as discussed above) this appears to be more of an allegation of one of the ways RBS vouchsafed the accuracy of its substantive misrepresentations.  (Am. Compl. at ¶303)

Even if the court assumes for purposes of this motion that all of the offering documents clearly alerted buyers like CUNA Mutual that third parties were the source of occupancy rates, the allegations state that RBS *directly* represented *to CUNA Mutual* that the owner-occupancy data provided was accurate.  Specifically, CUNA Mutual alleges that its own due diligence went well beyond simply relying on the terms of the written offering documents and that RBS traders gave additional assurances to follow-up inquiries by representatives of CUNA Mutual about the accuracy of the owner-occupancy data and the steps RBA took to "reunderwrite" a sample of the loans in the mortgage pool to assure their accuracy.  (Am. Compl. ¶¶ 47-48.)  According to the Complaint, RBA represented that this re-underwriting process included

> confirming data such as borrower income, debt, credit history, the value of the mortgaged property (and hence the LTV ratio), other liens on the property (and hence the CLTV ratio), and whether the borrower was shown as a mortgagor on another loan (hence whether he occupied the presently mortgaged property), among other things.

(*Id.* ¶ 48.)  At least as alleged, the natural -- and surely a reasonably inferred -- message conveyed by RBS, in advertising its underwriting procedures to potential buyers, was that it was vouching for the accuracy of the owner-occupancy data contained in the prospectus and supplements.

RBS offers two unavailing arguments as to why the alleged re-underwriting assurances do not amount to a ratification of the loan statistics.  First, it contends that there is no allegation in the Complaint that RBS ever purported to have vetted every single loan.  This argument somewhat misses the point that RBS *was standing behind* every single loan, based on the results it obtained after re-underwriting a representative sample

(or at least CUNA Mutual could be permitted to so prove).  (Am. Compl. ¶ 49.)  Second, RBS contends that CUNA Mutual should have just ignored RBS traders' representations about re-underwriting (or at least should not have taken such statements as affirmations of the accuracy of the statistics) because the "prospectus supplements specifically instructed CUNA Mutual to rely on their contents, and indicated that the drafters had not authorized anyone to provide information inconsistent with that contained in the prospectus supplements."  (Am. Compl. ¶ 50).  On the current record, however, neither the prospectuses nor their supplements amount to an integrated contract between CUNA Mutual and RBS, leaving open CUNA Mutual's right to try to prove that the purchase decisions made by CUNA Mutual were based on a number of factors, including both the offering documents *and* additional representations by RBS traders independent of those documents.

At this relatively early stage of the litigation, RBS also resists the conclusion that the statistics provided to CUNA Mutual were false, arguing that this is simply not plausible.  The court disagrees.  CUNA Mutual has alleged that it commissioned a post-hoc, forensic investigation of the loan pools in order to test the accuracy of the represented occupancy rates and found substantial inaccuracies.  (Am. Compl., dkt. #29, ¶¶80-86.)  After investigating the securitized mortgaged properties by researching contemporaneous property tax records, lien records, and credit records, it found that RBS overstated the number of owner-occupied properties in each security by 5% to 16%, with an average overstatement of 12%.  (*Id.* at 86.)  CUNA Mutual may have an uphill battle convincing a fact finder that RBS's statistics were wrong simply on the strength of its

13

public-records-based forensic analysis, or that any deviation was material, but at the motion to dismiss stage, CUNA Mutual has certainly alleged enough facts to make out a plausible claim that the occupancy numbers in the prospectuses and prospectus supplements were significantly inflated.

### b.  LTV and CLTV data

RBS is also alleged to have provided CUNA Mutual direct misrepresentations about the value of the loans securing its certificates.  As alleged by CUNA Mutual:

> RBS's Offering Documents presented detailed LTV or CLTV data for the underlying mortgage loans, including the number of mortgage loans with LTV or CLTV ratios within specified ranges, and weighted average LTV or CLTV ratios by aggregate balance.   RBS represented that there were maximum allowable LTV and CLTV ratios for the underlying mortgage loans based on the relevant Originators' underwriting guidelines.

(Am. Compl. ¶ 53.)

> As with the owner occupancy rates, CUNA Mutual also alleges that:

> For every one of the certificates at issue, CUNA Mutual had follow up conversations with RBS either by phone or by email about the certificates and about the quality of the loan pools backing the certificates. In those conversations . . . . RBS represented to CUNA Mutual that as part of its due diligence efforts, RBS . . . . specifically review[ed] individual loans in the pools to ensure that . . . they [were] represented accurately . . . and confirm[ed] data such as. . . the value of the mortgaged property (and hence the LTV ratio), other liens on the property (and hence the CLTV ratio).

(*Id.* ¶¶ 47-48.)

RBS argues that its representations, if any, could not have been "false" because statements about value constitute opinions, not facts.  As a general proposition, that is

true.  *See* Restatement (Second) Contracts § 168(1).  However, the law recognizes two circumstances in which statements of opinion may still be grounds for equitable rescission based on misrepresentation.  The first recognizes that expressions of opinion are also implied factual statements of the speaker's honestly-held beliefs.  Recission may, therefore, be appropriate where a party to a contract expresses an opinion that he or she does not hold in good faith.  *See* Restatement (Second) of Contracts § 168 cmt. a ("A statement of opinion is also a statement of fact because it states that a person has a particular state of mind concerning the matter to which his opinions relates . . . .").  This first theory of misrepresentation plays no role in this case, because CUNA Mutual expressly disavows that RBS deliberately misrepresented property values.  (Comp., dkt. #29, ¶9.)

The second circumstance recognizes an actionable misrepresentation where the person asserting the opinion has special knowledge justifying the other side's reliance *and* the opinion is not "substantially true."  *Kraft v. Wodill*, 17 Wis. 2d 425, 434, 117 N.W.2d 261, 265 (Wis. 1962).  Accordingly, "conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading."  *Va. Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1093, 111 S. Ct. 2749, 2758 (1991).  *See also Grove Holding Corp. v. First Wis. Nat. Bank of Sheboygan*, 12 F. Supp. 2d 885, 890 (E.D. Wis. 1998) ("[S]tatements of opinion that carry with them an implied assertion that the speaker knows facts exist which support the opinions [can be] considered representations of fact.").  In one illustrative case, an inventory of frozen seafood was valued by its seller at $3,000, but proved to be

15

spoiled and essentially worthless, making the representation of value technically an opinion, but so unsupported by objective facts that it was considered an actionable misrepresentation. *Schnuth v. Harrison*, 44 Wis.2d 326, 335, 171 N.W.2d 370 (Wis. 1969). The question of whether an opinion should be treated as fact under this theory is often left to the discretion of the jury, unless, of course, a reasonable juror could only come to one conclusion. See WIS JI-CIVIL §§ 2401, 2403.

Although it is a close question, the differences between the results produced by CUNA Mutual's property valuation (which the court accepts as the accurate value for purposes of this motion) and the estimates provided by RBS appear on the allegations in the complaint to be enough that a reasonable juror *might* find that RBS's figures were objectively unsupported by the underlying facts. CUNA Mutual relies upon property values that it independently calculated for a large (roughly 40% of the total) sample of the mortgaged properties comprising each security. Its model determined that: (1) the *actual* weighted average LTV ratio was 11% higher than the weighted average LTV ratio as represented by RBS; (2) some 25% to 43% of the tested loans in each RMBS had actual LTV ratios more than 10 percentage points higher than represented by RBS; (3) 15.3%-32% of the tested loans had an actual LTV ratio of more than 15 percentage points higher compared to RBS's samples; and 6%-16% of the tested loans had an actual LTV ratio of over 25 percentage points of the RBS sample.

CUNA Mutual prefers to frame the data in another way, pointing out that: (1) the number of loans with LTV ratios over 90% (risky loans) was 143% to 2176% higher than represented; and (2) whereas RBS claimed that none of the loans had an LTV over

16

100% (meaning it was underwater), in fact, an average of 16.5% of loans in each security pool were underwater.  CUNA Mutual alleges similar discrepancies with respect to CLTV ratios, based on the same model.  Remembering the aphorism about "lies, damn lies, and statistics,"[8] the court takes CUNA Mutual's sensational figures with a dash of salt.  For example, as RBS notes, it is certainly possible to overstate the amount of discrepancy by framing the comparison around a hand-selected and somewhat arbitrary threshold, such as 90% or 100% LTV.  Nevertheless, the difference between the RBS's representations and CUNA Mutual's valuations is noticeable (and the trier of fact might find material) from many angles.

Looking simply at the differences in average valuation, the allegations in this case can be compared with those considered by the Wisconsin Supreme Court in *Kraft*, which involved a misrepresentation claim arising out of the valuation of and subsequent purchase of a tavern.  17 Wis. 2d 425, 117 N.W.2d 261.  In *Kraft,* the court held that a mere 10 percent difference between the actual value and quoted value of the tavern made the seller's estimate "substantially true."  *Id.* at 434.  In this case, the Complaint similarly states that the average of all of the LTV and CLTV values supplied by RBS was 11%-12% lower than CUNA Mutual's figures.  But a 10% differential in property valuation in *Kraft* and here may mean very different things.  *Kraft* dealt with a sample size of one.  An 11 percent variation in one sample is arguably less suspicious, than an 11 percent

---

[8] Often attributed to Mark Twain, who in turn attributed it to British Prime Minister Benjamin Disraeli, the original source of this phrase -- and a related one involving "fibs, lies and experts" -- appears unknown.  *See* "lies, damn lies and statistics," Wikipedia, http://en.wikipedia.org/wiki/Lies,_Damn_Lies_and_Statistics (last visited August 19, 2013).

difference that was maintained on *average* over thousands of samples.  The latter suggests a more serious, not to mention more statistically significant, overestimation problem.[9]

Seeking to lay bare the objective inaccuracy of CUNA Mutual's alleged attempts at retroactive valuations, RBS points out that between 1% and 82% of the loans in each security were purchase-money mortgages, whose property valuations could not have been inflated, because they were based on the lower of the appraisal or the actual sales price of the mortgaged properties (assuming market price to be the best measure of value).  (*See* Reply Br., dkt. #51, p. 13 n. 11.)  Even if accepted as fact, this does not necessarily undermine CUNA Mutual's allegations about falsity because the complaint alleges only that a significant portion of the LTV and CLTV ratios for each security certificate were inflated, making the *average* ratios too high, rather than every property was overvalued. Excluding all purchase money mortgages, the remainder still makes up between 18% and 99% of the mortgages in each issued security.  RBS will have an opportunity on summary judgment to demonstrate the flaws in CUNA Mutual's valuation model, but for now, the court finds the allegations of objective falsity at least plausible.

In addition to disputing whether its data can be deemed objectively "incorrect" when compared to CUNA Mutual's own valuations, RBS also questions the validity of

---

[9]  CUNA Mutual's argument that the home valuations were objectively false is also more viable given what is known now about the loan origination industry in general during this period, and taking into account CUNA Mutual plausible theory for why the statistics may have been systematically inflated.  It contends that "[o]riginators and appraisers conspired to inflate property values in order to support a greater volume of loan originations," (Am. Compl. ¶ 76), and makes specific claims about the practices of many of the loan originators who contributed mortgages to the securities at issue. (*See* Am. Compl. ¶¶ 133-281).  Whether this knowledge (or reckless disregard) is attributable to RBS is a matter for discovery.

the valuation model CUNA Mutual uses.  Here again, CUNA Mutual must be given the benefit of the doubt at the pleading stage.   CUNA Mutual describes its method of verifying property values as an "industry-standard" automated valuation model ("AVM"), which "[m]ortgage originators and servicers routinely use[] as a way of valuing properties during pre-qualification, origination, and servicing."  (Am. Compl. ¶ 59.)  The AVM in use here is alleged to be "one of the most comprehensive and accurate models available. It incorporates a database of more than 500 million mortgage transactions covering ZIP codes that represent more than 97% of all properties, which are occupied by more than 99.7% of the population in the United States."  (Am. Compl. ¶ 60.)

RBS argues that in order to plead a plausible claim of inaccuracy, CUNA Mutual must disclose exactly how its own valuation model appraises property, so that this court can evaluate CUNA Mutual's competing methodology for reasonableness.  RBS cites as support *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771-72 (2nd Cir. 1994), in which the Second Circuit noted the difficulty of appraising property retroactively in a RICO fraud claim based on inflated property values, and then affirmed dismissal on the basis of perceived flaws in the plaintiff's appraisal calculations.  The Second Circuit in *First Nationwide* found that the disclosed valuation methodology was flawed even at the pleading stage (and without the aid of any expert testimony).  *Id.*   But there are important differences between that pleading and the Complaint here.  The Second Circuit noted the difficulty of reconstructing the general valuation of property retroactively and the specific failure in plaintiff's model to account for obvious changes in market factors.

Here, as plead at least, the plaintiff claims to have adopted a very specific methodology accepted at the time RBS reported loan data and to have used contemporaneous data.   Moreover, the court harbors doubts about its ability to undertake the task of substantively critiquing the model at this stage of the case, as well as the propriety of delving further into the facts surrounding the valuation methods used (or purported to have been used) pre-sale.   *See, e.g.*, *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 204 (D. Mass. 2012) ("[T]hese arguments regarding the methodological flaws of the AVM . . . are premature at the motion to dismiss stage.").

### c.  Credit ratings

While the Complaint alleges sufficient facts to make out a plausible claim that RBS misrepresented the accuracy of owner-occupancy, and LTV and CLTV data to CUNA Mutual, the same is not true with respect to reported credit ratings issued by the "Big Three" ratings agencies in RBS's offering documents.   Any reasonable investor would understand that RBS's citation to a Moody's, S&P or Fitch rating meant only that the agency had issued that rating, not that RBS had independently confirmed the ratings' accuracy through its own due diligence.   Furthermore, a reasonable investor could not have confused RBS's assurances of "re-underwriting" with an assurance of the overall accuracy of proprietary credit ratings by these national agencies.   While RBS *might* have attempted to second-guess the ratings agencies' credit ratings through its own internal underwriting, the Complaint stops short of alleging that RBS ever indicated that was the purpose or result of its re-underwriting practices.

CUNA Mutual also advances a separate, more subtle argument that RBS *indirectly* "ratified" the ratings insofar as it vouched for the underlying owner-occupancy and LTV data upon which the ratings were calculated, but this is a bridge too far since the agencies apparently use more than just these two pieces of data.  Furthermore, it is too great an inferential leap to allege that in promoting agency credit ratings and vouching for some of the data suspected to be used by the ratings agencies, RBS was vouching for the validity of the ratings themselves.

### d.  Underwriting procedures followed by loan originators

Finally, CUNA Mutual alleges that "RBS's representations regarding the underwriting processes, underwriting quality, loan selection, credit enhancements, use of exceptions, and ratings" employed by loan originators "were all false."  (Am. Compl. ¶ 106.)  According to the Complaint,

> RBS represented that, as part of their underwriting process, the relevant Originators had: (i) evaluated the credit standing and repayment ability of prospective borrowers and the value and adequacy of the mortgaged property as collateral; (ii) granted exceptions to the underwriting guidelines only if based on compensating factors; (iii) calculated each borrower's debt-to-income ratio and included in the collateral pool only mortgage loans with a debt-to-income ratio below a threshold level; and (iv) imposed lower LTV and CLTV ratio ceilings on borrowers with greater credit risk.

(*Id.* at ¶ 104.)[10]

---

[10] RBS complains that CUNA Mutual is only able to plausibly allege abandonment of underwriting guidelines by attaching its *general* allegations about sloppy underwriting to its specific allegations about the inaccurate LTV data in this case.  (Dkt. #51 at 16.) Because one role of an underwriter is to calculate reasonable LTV ratios, however, objectively inaccurate LTV values could be evidence of underwriter error (or an

CUNA Mutual alleges that RBS made these representations in (1) the offering documents themselves, (*see, e.g.*, Prospectus for AMSI 2004-FRI, CD Ex. E, pp. 19-20), and (2) in follow-up conversations between CUNA Mutual and RBS representatives.  In defense, RBS points out that some of the securities offering documents contain what appears an effective disclaimer stating, for example, that RBS did not make "any representations or warranties as to the accuracy or completeness of [the] information provided."  (Prospectus Supplement for RBSGC 2005-A series, dkt. #25, ex. C, p. S-61.)  But RBS has no defense to CUNA Mutual's allegations about subsequent personal assurances made by RBS representatives that arguably supersede the disclaimers.  A jury might find the disclaimers do not apply given CUNA Mutual's allegations that "RBS [separately] represented to CUNA Mutual that as part of its due diligence efforts, RBS re-underwrote a portion of the mortgage pools . . . . specifically reviewing individual loans in the pools to ensure that . . . they were issued in compliance with the Originators' own underwriting guidelines."  (Am. Compl. ¶ 48.)

CUNA Mutual alleges that the representations were false because originators routinely violated their own underwriting standards, "ignor[ing] borrowers' actual repayment ability and the value and adequacy of mortgaged property used as collateral," and making "[s]ystematic, bulk exceptions to underwriting standards . . . without consideration of any compensating factors."  (Am. Compl. ¶ 106.)  These sweeping allegations appear plausible in light of the detailed facts contained within the Complaint, describing: (1) far-higher-than-expected default rates on the securitized mortgages (*id.* at

---

underwriter's intentionally or negligently overlooking what he or she knows to be inflated property valuations) or at least a reasonable trier of fact might so infer.

¶¶ 282-95); (2) sloppy or intentionally lax origination practices employed by most of the loan originators, citing statements from loan originator employees, newspaper reports and official government investigations (*id.* at ¶¶ 149-281); and (3) a "systemic breakdown in accountability and ethics in the mortgage industry" (*id.* at ¶¶ 132-148).

Nevertheless, RBS argues that the claims are merely conclusory in the absence of more specific allegations identifying the underwriting standards that were not met with respect to each individual mortgage loan. It finds some support for its argument in a few unpublished opinions, *N.J. Carpenters Health Fund v. NovaStar Mortgage, Inc.*, No. 08 Civ. 5310(DAB), 2012 WL 1076143, at *5 (S.D.N.Y. March 29, 2012); *Foothridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050(PKC), 2010 WL 3790810, at *12–13 (S.D.N.Y. Sept. 28, 2010), but if this court were to adopt that standard with respect to the many thousands of securitized loans at issue in this case, an adequate pleading would necessarily run to the thickness of a dictionary. The court finds more practical, as well as adequate under current pleading standards, a practice that excuses CUNA Mutual from alleging the flaws in individual mortgage loans in lieu of detailed allegations showing widespread abandonment of underwriting standards by the loan originators. *Accord, Plumbers' Union Local No. 12*, 632 F.3d at 773-74, 777; *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, No. 08-CV-8093 (LTS), 2012 WL 1076216 (S.D.N.Y. Mar. 30, 2012); *Mass. Mut. Life Ins. Co. v. Residential Funding Co.*, CA Nos. 11-30035-MAP *et al.*, 2012 WL 479106, at *5 (D. Mass. Feb. 14, 2012); *Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, No. CIV 09-0300 JB/KBM, 2011 WL 5840482, at

*68-69 (D.N.M. Nov. 12, 2011); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650, 656, 672-73 (S.D.N.Y. 2011).

RBS also argues that it always made clear to prospective buyers that (1) exceptions would be made to the underwriting guidelines on a case-by-case basis where such exceptions were warranted, and (2) because the loans were being made to "lower credit quality borrowers," the loans would be "more likely to experience late payments and defaults and increase[d] . . . risk of loss."  (*See, e.g.*, RBSGC 2005–A Prospectus, dkt. #25, ex. D at 10.)  However, as courts have recognized in analogous cases under the Securities Act of 1933, there is a material difference between (1) warning a buyer that subprime loans are risky and that exceptions to underwriting rules may be made in exceptional circumstances, on the one hand; and (2) as is alleged here, disclosing that loans have been disbursed regardless of the borrower's ability to repay and without any consideration of the approved underwriting guidelines, on the other hand,.  *See, e.g.*, *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 773 & n.11 (1st Cir. 2011); *Pub. Employees' Ret. Sys. of Miss. v. Goldman Sachs Group, Inc.*, No. 09 CV 1110(HB), 2011 WL 135821, at *10 (S.D.N.Y. Jan 12, 2011); *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 971 (N.D. Cal. 2010).

Finally, and more convincingly, RBS argues that the complaint fails to provide specific, concrete examples of abandoned underwriting standards with respect to each of the originators who contributed loans to the challenged securities.  One federal appellate court faced with a similar, multi-originator claim has held that two specific allegations are required to establish the nexus of plausibility sufficient survive a motion to dismiss:  (1)

an originator abandoned its underwriting standards, and (2) a "'sharp drop in the credit ratings'" or some similar evidence that loans were indiscriminately granted. *See Plummer's Union Local No. 12*, 632 F.3d at 773–74. The court adheres here to that same two-prong standard, which seems to reach an appropriate balance in the required specificity of pleading.[11] Claims directed against originators that do not meet the first prong -- and thus rest on the shaky foundation of allegations that the loans lost value quickly and other players in the industry were abandoning their standards -- are not enough to render CUNA Mutual's equitable rescission claim plausible. *See Twombly*, 550 U.S. at 545, 127 S. Ct. at 1959 (2007) (noting that plausibility "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]").

CUNA Mutual's claims meet the plausibility standard for many of the loan originators, but not all of them. For three of the securities at issue, CUNA Mutual has made no specific allegations respecting the underwriting standards of any contributing mortgage loan originator. Absent specific allegations against at least one relevant originator, CUNA Mutual has not stated plausible claims based on an abandonment-of-underwriting standards against the following security certificates: MMLT 2005-3, RAMC 2004-4, RAMC 2005-4.

### ii. Materiality

In a Wisconsin rescission action, a misrepresentation is material if it is likely to induce a reasonable person to enter into a contract *or* if the person making the

---

[11] Given that plaintiff is essentially claiming "mistake" here, this threshold seems especially appropriate, even if RBS has not argued a lack of specificity pursuant to Fed. R. Civ. P. 9(b).

misrepresentation knows that it is likely to induce the particular recipient to enter into the contract. *Notte*, 97 Wis. 2d at 223. Owner-occupancy statistics, LTV ratios, and assurances that loan originators complied with their own underwriting standards are all relevant to a buyer's assessment of default risk, and thus the expected return on its investment. At least as alleged, therefore, this information would appear material to CUNA Mutual's decision to purchase the securities certificates on a pool of securitized loans.

### iii.  Justifiable reliance

The third and final element of a misrepresentation-based rescission action under Wisconsin law is justifiable reliance. Reliance exists if the representation substantially contributed to the recipient's decision to enter into the contract, although it need not be the sole inducing cause of the recipient's consent. Restatement (Second) of Contracts § 167, & cmt. a. That CUNA Mutual actually relied on RBS's alleged misrepresentations about the characteristics of the loans securing its investment would seem apparent from the allegations.

Reliance on a representation of fact will be justified as long as the recipient "act[s] in good faith [and] conform[s] his conduct to reasonable standards of fair dealing." *Notte*, 97 Wis. 2d at 224. *See also* Restatement (Second) Contracts § 172. Citing to the text of the offering documents, RBS argues that CUNA Mutual was not justified as a matter of law in relying on the data provided because these documents unmistakably warned readers that sub-prime loans were risky bets and that fluctuations in property values left some buyers (particularly those with lower-ranked tranches in the security)

26

with considerable risk exposure.  As previously discussed, however, these disclaimers do not address CUNA Mutual's allegations that it purchased the certificates despite the risks associated with securitized mortgage loans in reliance on RBS's specific representations that the underlying loans were accurately described.  The allegations, therefore, permit an inference that CUNA Mutual behaved reasonably in relying on RBS's factual statements about owner occupancy and adherence to underwriting standards.

At least, CUNA Mutual may argue that as a buyer several steps removed from the loans themselves, and without access to hard data about the securitized loans, it justifiably relied on direct conversations with RBS traders, who claimed to be knowledgeable and confirmed the accuracy of the information it received about the loans in the offering documents.  Indeed, CUNA Mutual alleges that these traders put RBS's own reputation on the line in responding that they had double-checked the key metrics in the loan files for a significant sample of the loans in each security and found no red flags that would suggest inaccuracies.  Whether or not the trier of fact ultimately agrees CUNA Mutual was justified in relying on these representations, the allegations are sufficient at the pleading stage.

The same is true -- albeit under a slightly different analysis -- with respect to the representation of LTV and CLTV ratios despite their having some of the characteristics of opinions discussed above.  Under Wisconsin law, a substantially inaccurate opinion may be actionable as "fact" if the recipient was entitled to "rely upon [it], without being guilty of a want of ordinary care and prudence."  See *Kraft*, 17 Wis. 2d 434.  Stated in a way more directly applicable to the facts of this case, "[t]o the extent that an assertion is

27

one of opinion only, the recipient is not justified in relying on it unless the recipient . . .

reasonably believes that, as compared with himself, the person whose opinion is asserted

has special skill, judgment or objectivity with respect to the subject matter.  Restatement

(Second) of Contracts § 169.  Here, CUNA Mutual alleges that it lacked access to the

loan files or to specific information regarding the mortgages and underwriting of the

securities, while RBS not only did have access, but represented that it had already "re-

underwritten" a significant sample of the loans for key factors, such as the LTV and

CLTV ratios.  Given RBS's position in the business of packaging and selling securities, its

privileged access to information and CUNA Mutual's position as an arms-length buyer

who relied on RBS to provide accurate information, the trier of fact may find that CUNA

Mutual justifiably relied on RBS's alleged misrepresentations about specific

characteristics of the properties securing its investments.

### C.  Unjust enrichment claim

In addition to its contract rescission claim, CUNA Mutual has pled unjust

enrichment as an alternative ground for equitable relief.  A claim for unjust enrichment

(an action in "quasi-contract" or an implied contract under Wisconsin law) may only lie

where the parties have not formed a contract.  *Greenlee v. Rainbow Auction/Realty Co.*, 202

Wis.2d 653, 671, 553 N.W.2d 257, 265 (Wis. Ct. App. 1996).  In this case, it is

undisputed that the parties *did* reach a valid contractual agreement, as CUNA Mutual's

claim for equitable contract rescission acknowledges.  Because there was a contract, the

28

doctrine of unjust enrichment simply does not apply here and CUNA Mutual's unjust enrichment claim must be dismissed.[12]

## II. Motion for spoliation sanctions

On February 8, 2013, RBS moved for spoliation sanctions against CUNA Mutual, arguing that it had "destroyed wide swaths" of electronically-stored information relevant to the decision to purchase the disputed securities certificates.  Given the seriousness of the allegations and the remedy sought -- essentially, dismissal of this case -- the court will not rule on this motion until summary judgment, when the claimed importance of this missing information (and any reasonable or legally-compelled inference) can be better understood against the overall record.

## III. Motion for Rule 26(g)(3) discovery sanctions

On April 9, 2013, RBS also moved for discovery sanctions under Federal Rule of Civil Procedure 26(g)(3), contending that CUNA Mutual asserted in its interrogatory responses that Mark Prusha — the CUNA Mutual employee responsible for purchasing the disputed securities — made his purchase decisions for six securities in reliance upon certain "preliminary" prospectus supplements.  Now, RBS says, it has come to light that five of the six preliminary supplements that Prusha supposedly relied upon do not exist, which means that CUNA Mutual's interrogatory responses are at the very least incorrect,

---

[12]  Since CUNA Mutual did not dispute, and thus effectively conceded, RBS's argument that its contract rescission claim is an action in equity, which does not warrant a jury trial under federal law, its request for a jury trial will also be denied.

and likely made in violation of Rule 26(g)(1)(B)(ii), which states that discovery disclosures should "not [be] interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation."   The court disagrees.

Mr. Prusha has testified that it is part of his usual process in analyzing securities offerings to consider the risk characteristics of the underlying mortgages, information that would have been provided to him by RBS in the form of term sheets, prospectus supplements and preliminary prospectus supplements.  (*See* Df's Br., dkt. #171, at 6 n. 8.)  Because the evidence reflects that actual prospectus supplements were issued after Mr. Prusha made his decision to purchase certain securities, CUNA Mutual has asserted and continues to maintain that Prusha in fact received and relied in part upon *preliminary* prospectus sheets for each of the five relevant securities.  CUNA Mutual concedes that it no longer has copies of these sheets in its files.

RBS's motion for sanctions boils down to an argument that CUNA Mutual should be punished for taking an untenable, factual position that the documents ever existed. RBS primarily relies upon *Project 74 Allentown, Inc. v. Frost*, 143 F.R.D. 77 (E.D. Pa. 1992), *aff'd* 998 F.2d 1004, where at trial "the plaintiff could not come forward with *any evidence*" to support a factual position maintained throughout the suit.   *Id.* at 91 (emphasis added).   But the situation here is dissimilar.  CUNA Mutual has already identified at least some evidence – Mr. Prusha's testimony – that supports, albeit indirectly, its factual position that the preliminary prospectuses existed.  While RBS is free to impeach Prusha's memory and credibility on this issue, and may well succeed, the

30

court is not in a position to judge at this stage whether CUNA Mutual and its counsel were acting in good faith in relying on Mr. Prusha's recollection in answering RBS's questions.

Certainly, RBS has marshaled some persuasive evidence showing that the five preliminary prospectus supplements never existed.  As an initial matter, the documents are not in CUNA Mutual's possession despite its policy to "hold all of the hard copy documents and working papers created during the deal evaluation process."  (Df's Br., dkt. #171, at 7.)  Nor are the preliminary prospectus supplements found on EDGAR, the SEC's filing system, which should also contain all such documents circulated to investors. But neither piece of evidence turns out to be as persuasive as it first appears.  That CUNA Mutual hasn't got a copy of the supplements is not dispositive; CUNA Mutual does not have copies of the final prospectus supplements either, but there is no question those documents existed.  (*Id.* at 6 n.8.)[13]  Mr. Prusha's testimony similarly suggests a better reason for the absence of these documents than sloppy document retention:  it was his practice to get rid of preliminary supplements once final supplements were published. As for the absence of the preliminary prospectus supplements from the EDGAR registry, this, too, has a plausible explanation in light of defendants' brief, which appears to concede that at least one other preliminary supplement cannot be found in EDGAR despite the fact that it is *known to exist*. (*Compare* df's br., dkt. #171, p. 6 n.8 *with* p.8.)

---

[13] Indeed, RBS itself seeks sanction against CUNA Mutual for wholesale failures to preserve documentary evidence from the same time frame and for failing to comply with its own internal record-keeping policies.  (*See* Motion for Spoliation Sanctions, dkt. #105.)

31

Even if the documents never existed, this does not necessarily lead to the conclusion that CUNA Mutual's discovery responses were unjustified at the time provided. For a significant portion of this case, CUNA Mutual appears to have been laboring under the good faith belief that while its deal files did not contain some of the documents Mr. Prusha claims that he would have relied upon, copies of those documents did exist at one time (and might still exist in RBS's possession). (See Pl's Br., dkt. #183, at 8.) In other words, in light of Prusha's affirmative testimony and in the absence of contrary discovery disclosures by RBS, CUNA Mutual could ethically assert the existence of the documents despite not having copies in their possession. *See* Fed. R. Civ. P. 26(g) (Advisory Comm. Notes to 1983 Amend ("In making the inquiry, the attorney may rely on assertions by the client . . . as long as that reliance is appropriate under the circumstances."); *Bd. of Dir. Water's Edge v. Anden Grp*, 136 F.R.D. 100, 108 (E.D. Va. 1991) (Rule 26(g) sanctions may not be awarded if the party has "reasonable grounds" for the discovery response or where "a reasonable attorney in [the litigant's] position could believe that the [challenged response] was factually justified"). Rather than rely upon CUNA Mutual's claims about the preliminary prospectus supplements (and incur "millions" in attorneys' fees defeating those claims), RBS was in the best position to know whether these documents existed, and it did nothing until moving for sanctions.

For its part, CUNA Mutual asks the court to award *it* attorneys' fees expended responding to RBS's motion for sanctions, arguing that RBS violated the court's instructions and standard orders by: (1) filing a motion regarding discovery without first making a good faith attempt to resolve the dispute; (2) failing to file discovery motions

promptly after discovery of the asserted deficiency; and (3) submitting under the guise of a sanctions motion what amounts to a de facto motion for summary judgment. Although RBS may have violated at least two of these prohibitions, the court declines to shift fees and costs at this time. The court will, however, take the instant denial of RBS's motion for sanctions into account, should RBS file any similarly dubious motions in the future, just as the court will revisit whether further sanctions are appropriate at the close of this case.

## IV. Request for leave to file a second amended complaint

More than a year into the case and after the deadline to amend pleadings set forth in the court's pretrial order (*see* dkt. #28 at 1), after substantial discovery, and after the parties have fully briefed RBS's motion to dismiss the first amended complaint, CUNA Mutual seeks permission to file a Second Amended complaint. The court is instructed by Federal Rule of Civil Procedure 15(a)(2) to "freely give leave" to amend "when justice so requires," but may deny a request in its discretion for bad faith, prejudice to the opposing party, the impact on timing in light of the requirement for expeditious trials, and the futility of the amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Rule 16(b)(4) establishes a roughly parallel requirement that a party demonstrate "good cause" before seeking to modify a portion of the court's scheduling order.

CUNA Mutual tells the court that the new complaint incorporates information unearthed in discovery that will allow it to: (1) add detail -- and thus plausibility -- to the allegations found in the First Amended complaint, and (2) add an alternative legal

ground for rescission.  The court will permit CUNA Mutual to amend its complaint to supplement its allegations with respect to its existing claim of misrepresentation, but will not permit CUNA Mutual to assert a new claim based on mistake.

### A. Supplemental allegations regarding rescission based upon misrepresentation

One of the two reasons CUNA Mutual asks for leave to amend its complaint is to "incorporate newly discovered evidence that buttresses [its] previous allegations and undermines many of the arguments RBS made in its motion to dismiss."  To the extent CUNA Mutual views the latest round of amendments as potentially necessary to save its case from RBS's motion to dismiss, the request is essentially moot as (1) CUNA Mutual may proceed in substantial part with its first amended complaint (*see supra* § I); and (2) none of the new allegations correct the isolated deficiencies identified by the court in dismissing a portion of that complaint.  That the proposed amendments will not impact RBS's motion to dismiss cuts both ways: because CUNA Mutual does not need the amendments to continue with this case it would seem less vital to the interests of justice to allow them; at the same time, because amending does not impact the motion to dismiss, RBS has lost its strongest argument of prejudice should the court allow an amendment.

RBS presents four additional reasons the court should deny leave to amend.  *First*, it argues CUNA Mutual has not provided "good cause" to amend the court's scheduling order, arguing that CUNA Mutual has not been diligent in seeking to amend.  On the contrary, given that the new allegations appear to be little more than a summary of the

34

evidence CUNA Mutual has uncovered through discovery and or through consultations with its experts, the amendments appear both timely and responsive to the ongoing discovery process.

*Second*, RBS complains of the prejudice that would result if the court were to allow CUNA Mutual to shift from an allegation that it relied upon prospectus supplements to an allegation that it relied in part on *preliminary* prospectus supplements for some of the disputed securities. This, says RBS, will require it to: "(1) undertake further written discovery; (2) take additional depositions (including of Mr. Prusha) concerning CUNA's new claim and allegations; (3) revise its summary judgment motion strategy; (4) retain new experts to address CUNA's theories about market and industry practices, as well as RBS's due diligence efforts; and (5) re-review the hundreds of thousands of documents that CUNA dumped on RBS with a view towards addressing CUNA's new allegations." (Df's Br., dkt. #185, at 11.) To the extent this is true, it is unfortunate, but of no surprise. It is the very nature of discovery for new facts to be unearthed and for parties' factual and legal positions to sometimes change as a result -- indeed, the Federal Rules of Civil Procedure permit some amendments through trial. *See* Fed. R. Civ. P. 15(b). To the extent RBS is truly "prejudiced," it is a kind of prejudice that can be remedied.[14]

While the distinction between prospectus supplements and preliminary prospectus supplements may be significant to RBS's defenses here, it seems understandable that CUNA Mutual might conflate the two at the early stages of its case, when even its own

---

[14] Recognizing that it would only be fair to allow RBS to conduct additional discovery based on the amended complaint, the court will not grant CUNA Mutual's informal motion for a protective order barring RBS from further deposing Mark Prusha, although any further questioning shall not exceed three hours.

internal records did not explain exactly which version of certain documents its employees were relying upon, particularly when it was nevertheless evident that the employees relied upon *some* version.  CUNA Mutual's present clarification that in some instances these were "preliminary prospectus supplements," rather than "prospectus supplements," is exactly the sort of nuance one might expect now that Mr. Prusha's full testimony is available to lay bare the exact timing of his purchase decisions in relation to the timing of the publication of various versions of the "offering documents."

*Third*, RBS argues that the proposed amendments would be futile "for all of the reasons its first amended complaint fails."  This argument is easily addressed since the court will allow much of the first amended complaint to proceed.  At the same time, RBS also argues that the heightened pleading standard for fraud found in Federal Rule of Civil Procedure 9 applies to the second amended complaint where it did not apply to the first amended complaint.  The critical difference, RBS contends, is that the latest complaint contains allegations that "sound in fraud" -- i.e., that suggest RBS intentionally misrepresented the facts.  Of the four numbered allegations in the proposed Second Amended complaint that RBS cites, only one really asserts intentional deception:

> "RBS's due diligence process was deeply flawed and either intentionally or recklessly allowed Materially Defective loans into the loan pools backing the RMBS.  Similarly, RBS actively manipulated the credit rating agencies to assign inflated credit ratings to the certificates CUNA Mutual purchased, thereby further masking their true attributes."

(Compl. ¶ 895.)  This specific factual allegation can be disregarded because it falls under the section of the complaint describing CUNA Mutual's unjust enrichment claim, a

portion of the complaint that will be dismissed (*see supra* § I) and that the second amended complaint does not successfully revive.

*Fourth*, RBS argues that by altering its allegations and its theory of the case repeatedly, CUNA Mutual has been grasping at straws in a bad faith attempt to extend its suit for as long as possible.  This is not the court's impression.  While CUNA Mutual's original complaint might have been somewhat under-researched (particularly in terms of treating all of the ten securities as a single unit, rather than addressing the differences between them), CUNA Mutual has articulated a plausible claim for relief.  That CUNA Mutual seems to be feeling its way toward a final version of the facts -- incorporating new evidence unearthed through discovery -- rather than sticking with its initial theory of the case, does not mean it is acting in bad faith.

### B.  Addition of a claim for rescission based upon mistake

The second reason CUNA Mutual offers for seeking to amend is its desire to add a new claim for rescission based upon mistake, which complements its existing claim for rescission based upon misrepresentation.  RBS's arguments find more traction against this proposed amendment.   CUNA Mutual does not convincingly explain why an argument based upon mistake could not have been added to the original complaint -- or at least proposed as an amendment in response to RBS's motion to dismiss filed a full year earlier than its request to amend.  In its motion to dismiss, RBS argues that even if information about the loans could be considered "false," it simply passed the data on to CUNA Mutual without making any representations about its accuracy.  While CUNA

Mutual contests this, the argument should have immediately suggested mistake as an alternative theory.  There are no good grounds to have waited so long to add this legal theory; and the delay of a year justifies denial of an untimely motion to amend.  See, *e.g.*, *Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*, 424 F.3d 542, 553 (7th Cir. 2005) (denying leave where plaintiff sought to amend nine months after the scheduling order's deadline, "failed to show good cause" for doing so, and was or should have been aware of the facts underlying its new claim much earlier).

## V.   Request for Order Instructing RBS to File an Immediate Answer

Next, the court turns to CUNA Mutual's motion for an order instructing RBS to file an answer to its second amended complaint within 10 days of the court's acceptance of that complaint.  Under Federal Rules of Civil Procedure 12(a)(4) and 15(a)(3), the usual time allowed for an answer to an Amended complaint is 14 days, and then only if RBS does not toll the deadline by filing a motion to dismiss the second amended complaint.  Here, CUNA Mutual asks the court to override the Federal Rules, having as yet not received an answer to its original or first amended complaints.  More specifically, CUNA Mutual believes that it is entitled to some notice of RBS's affirmative defenses before the summary judgment deadline so that it is not "ambushed" by unanticipated defenses or counterclaims.

The equities do not favor CUNA Mutual's request for this extraordinary relief. Under the Federal Rules of Civil Procedure, RBS would have been required to supply an answer within 14 days of the issuance of this order if *CUNA Mutual* had not sought leave

to file and serve a second amendment to its complaint, making CUNA Mutual partially, if not wholly, to be blame for any further delay.  Bearing that in mind, the court declines to disturb RBS's right to move, answer, or otherwise respond within the time set by those Rules.[15]

## VI. Rule 37(c) motion to strike and exclude expert testimony

Finally, the court addresses RBS's recent motion to strike the listing of a "to-be-identified" CoreLogic employee from CUNA Mutual's expert witness disclosures and to bar CUNA Mutual from introducing expert witness testimony from any CoreLogic employee.  The court will limit CUNA Mutual to using the non-expert testimony of Ms. Jacqueline Doty, CoreLogic's already-deposed Rule 30(b)(6) representative, as well as shift RBS's fees and costs directly attributable to CUNA Mutual's failure to withdraw its disclosure of an unnamed CoreLogic employee.

As thoroughly discussed above, CUNA Mutual's complaint is premised in significant part upon allegations that RBS provided inaccurate LTV and CLTV data. CUNA Mutual believes that RBS's data is inaccurate because it diverges from the results of a popular home valuation model produced by a third party, CoreLogic Solutions LLC. The data generated by this model is central to CUNA Mutual's theory of liability premised upon inaccurate LTV and CLTV statistics, and must come into evidence somehow if CUNA Mutual is to prevail on that theory.

---

[15] CUNA Mutual's motion to force an answer has also been mooted by this court's stay of proceedings pending issuance of this opinion and order.

There would appear two ways in which CUNA Mutual can present the CoreLogic data to the fact-finder:  (1) directly through the testimony of a CoreLogic employee, or (2) indirectly through the testimony of an expert witness's opinions under Federal Rule of Evidence 703.[16]  RBS does not appear to challenge CUNA Mutual's *right* to introduce the data through Rule 703, and CUNA Mutual takes care in arguing that it has preserved this right.  Instead, RBS's motion to strike focuses entirely on the possibility that CUNA Mutual may seek to introduce expert witness opinion testimony from a CoreLogic employee.  RBS argues that this option should be barred because CUNA Mutual has not disclosed a CoreLogic expert in compliance with Federal Rule of Civil Procedure 26.  The court agrees.

### A.  Violation of Rule 26(a)(2)

Rule 26(a)(2)(A) imposes upon a proponent of expert witness testimony a duty to identify its experts in a pretrial disclosure.  In addition, the proponent must provide an expert report describing the substance of the proposed testimony if its witness is "retained or specially employed to provide expert testimony in the case or [is] one whose duties as the party's employee regularly involve giving expert testimony."  If the witness falls outside this category, the proponent must still provide a less detailed "written disclosure" of the intended testimony. Fed. R. Civ. P. 26(a)(2)(B) & (C).  All disclosures must be made at "the times and in the sequence that the court orders."  *Id.* at (2)(D).

---

[16] The court makes no ruling at this time about the admissibility of the CoreLogic model data, whether offered as information relied upon by its expert under Rule 703 or introduced through a fact witness.

Despite have asked CUNA Mutual to provide expert testimony, CUNA Mutual chose not to identify a specific CoreLogic witness by the court's deadline for expert witness disclosures, nor did it produce a 26(a)(2)(B) expert report.  Instead, CUNA Mutual disclosed that a "yet-to-be-identified corporate representative of CoreLogic, Inc. and CoreLogic Solutions, LLC may present testimony at trial," presenting RBS with a 26(a)(2)(C) disclosure of the anticipated testimony of this expert:

> testimony at trial on the following subject matters: (1) CoreLogic's ValuePoint 4 retrospective Automated Valuation Model (AVM); (2) the databases, data, methodologies, and assumptions upon which the ValuePoint 4 retrospective AVM relies; (3) the accuracy and reliability of the ValuePoint 4 retrospective AVM; (4) the results of the ValuePoint 4 retrospective AVM for the loans collateralizing the ten residential mortgage-backed securitizations (RMBS) at issue in this litigation. If a representative of CoreLogic testifies at trial, CUNA Mutual anticipates that he or she will testify that the ValuePoint 4 retrospective AVM relies on CoreLogic's industry-leading databases containing hundreds of millions of recorded real estate transactions, that the retrospective AVM is reasonably accurate and reliable, and that the AVM results for the loans collateralizing the RMBS at issue are reasonably accurate and reliable.

(Pl's Rule 26(a)(2)(C) Disclosure, dkt. 209-5, at 2.)

Following this disclosure, both sides apparently deposed Jaqueline Doty, CoreLogic's Rule 30(b)(6) representative.  CUNA Mutual's counsel questioned Ms. Doty about each of the topics identified in the disclosure quoted above.  RBS apparently also tried to depose Doty on the same subjects, but she refused to answer several questions on the ground that she would not be testifying as an expert at trial.

On the basis of this factual background, RBS identifies two violations of Rule 26(a)(2): failure to name a specific witness in violation of Rule 26(a)(2)(A) and failure to

provide a Rule 26(a)(2)(B) expert report.   In instructing the proponent of expert testimony to identify the expert witness, Rule 26(a)(2)(A) undoubtedly requires disclosure of a specific individual by name.  See *Ballinger v. Casey's Gen. Store, Inc.*, 2012 WL 1099823, at *1 (S.D. Ind. Mar. 29, 2012) (not reported) (citing *Tribble v. Evangelides*, 670 F.3d 753, 759 (7th Cir. 2012)) ("Rule 26(a)(2)(A) requires that the "witness" be identified by name; listing the institution in which the witness is associated is insufficient.").  CUNA Mutual does not and cannot reasonably contest that it violated this rule.  This alone answers the primary issue before the court:  having identified no one by name from CoreLogic as a testifying expert by the court imposed deadline, the court will exclude anyone from that firm from providing expert opinion testimony at trial.

CUNA Mutual more strenuously contests its obligation to provide a Rule 26(a)(2)(B) expert report, arguing that when CoreLogic was first hired, it was asked and agreed only to serve as a non-testifying, consulting expert.  Despite paying over $300,00 for that work, CUNA Mutual asserts that a CoreLogic representative would, therefore, technically fall outside the literal language of 26(a)(2)(B) and should only be required to submit a disclosure under (C).  This position is frivolous on the facts before the court.

As a linguistic argument, CUNA Mutual may have the better of the argument, since everyone agrees that CoreLogic was initially retained to consult, not testify.  But this is *not* an argument over linguistics, it is litigation and CUNA Mutual's refusal to acknowledge the obvious -- that it *now* seeks to offer CoreLogic's testimony as a specially retained expert -- has caused needless expense for its opponent and now the time of the

42

court.  As RBS points out, any expert retained by a party who is designated to give expert testimony should be required to provide a full expert report.

Two basic principles operate at cross-purposes and animate the distinction between 26(a)(2)(B) and (C).  *See generally* 8A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2031.2 (3d ed. 2010).  On the one hand, full disclosure of the substance of all expert testimony is encouraged, as it lessens the burden in time and money of having to take the deposition of and obtain other discovery regarding the possible testimony of every expert witness named in the case to avoid surprises at trial. *See id.* at text accompanying fn. 8; *Innogenetics, N.V. v. Abbott Laboratories*, 578 F. Supp. 2d 1079, 1089 (W.D. Wis. 2007).  On the other hand, experts who have not been specifically retained to testify at trial, but who are nevertheless called to testify because of an incidental relationship with the facts (e.g. a treating physician or party employee), may resist being conscripted into the more laborious aspects of acting as an expert witness, such as drafting a comprehensive Rule 26(a)(2)(B) expert report.  *See Wright & Miller* § 2031.2 at text accompanying fn 10.

CUNA Mutual argues that CoreLogic falls somewhere in the middle of this spectrum, having been retained to assist CUNA Mutual's preparation of evidence relevant to litigation, but not (if CUNA Mutual is believed) with the understanding that it would be a participant in the litigation itself.  But as RBS points out, accepting this distinction would leave a gaping hole in Rule 26(a)(2)(B), easily driven through by any party retaining an expert as a mere "consultant," so as to be able to claim that the expert was not "retained or specially employed to provide expert testimony," and then later

designate the expert to testify (seemingly gratis) while making no more than a vague 26(a)(2)(C) disclosure.  Any concerns with burdening an expert with the obligation to write a Rule (B) report are considerably lessened when the expert has agreed to be retained and to be paid for his or her time.  Indeed, within the class of specially-retained experts, the principal reason for hiring a "consulting" (rather than "testifying") expert (as CUNA Mutual claims to have originally done here) has nothing to do with relieving the expert of certain obligations, but rather to insure that the expert's work and consultation with counsel, and indeed identity, are all subject to work product privilege and, therefore, bar discovery by the other side.  Fed. R. Civ. P. 26(b)(4)(D).  As a practical matter, once named as a testifying expert, this privilege is lost and the named party should expect to provide a timely 26(a)(2)(B) report.

### B.  Sanction

Failure to comply with Rule 26(a)(2) results in sanction: the offending party is not allowed to introduce the expert witness's testimony as "evidence on a motion, at a hearing, or at a trial."  *See* Fed. R. Civ. P. 37(c)(1).  Exclusion of the witness's testimony is "automatic and mandatory" unless the offending party can establish "that its violation of Rule 26(a)(2) was either justified or harmless."  *Keach v. U.S. Trust Co.*, 419 F.3d 626, 639 (7th Cir. 2005) (*quoting David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)).

Given CoreLogic's refusal to act as an testifying expert, its refusal to cooperate in producing an expert witness and CUNA Mutual's failure to name a particular CoreLogic

44

employee witness under 26(a)(2)(A), the refusal to withdraw its expert designation was inexcusable.  This failure is also not harmless.  Thus far, RBS has been unable to prepare fully for summary judgment and trial because it still does not know who all of plaintiff's expert witnesses are, much less to what they will testify.  As between CUNA Mutual and RBS, it is the former that should bear the brunt of any harm caused by its ongoing failure to disclose a specific expert witness.

The court has some flexibility in crafting an appropriate sanction.  *See* Fed. R. Civ. P. 37(c)(1).  Obviously, CUNA Mutual will be precluded from offering any expert opinion testimony from a CoreLogic representative.  In addition, CUNA Mutual will be precluded from using anyone other than Jacqueline Doty as a non-expert witness for CoreLogic.  Finally, CUNA Mutual must reimburse RBS for its actual attorneys' fees and costs incurred in bringing this motion.

## ORDER

IT IS ORDERED that:

(1) Defendant RBS Securities Inc.'s unopposed request for judicial notice (dkt. #34) is **GRANTED**.

(2) Defendant's motion to dismiss the Complaint (dkt. #32) is **GRANTED** with respect to plaintiff's (a) claims based on misrepresentation of credit ratings; (b) claims based on misrepresentation of underwriting compliance for securities MMLT 2005-3, RAMC 2004-4, and RAMC 2005-4; and (c) unjust enrichment claim; and **DENIED** with respect to the remaining claims.

(3) Plaintiffs CMFG Life Insurance Company, CUMIS Insurance Society, Inc. and Members Life Insurance Company' request for a jury trial is **DENIED**.

(4) Defendant's motion for spoliation sanctions (dkt. #100) is **RESERVED**.

(5)     Defendant's motion for Rule 26(g)(3) Discovery Sanctions (dkt. #170) is **DENIED**.

(6)     Plaintiffs' request for leave to file a Second Amended Complaint (dkt. #180) is **GRANTED** with respect to new factual allegations supporting its claim of rescission based on its remaining misrepresentation claims and **DENIED** with respect to its new theory of rescission based on mistake.

(7)     Plaintiffs' motion to set a different time to answer (dkt. #182) is **DENIED**.

(8)     Defendant's motion to strike and exclude expert opinion testimony by a representative of CoreLogic (dkt. #207) is **GRANTED** consistent with the court's discussion above.

(9)     Defendant shall be awarded its actual attorney fees and costs incurred in bringing this motion to strike.

Entered this 19th day of August, 2013.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge