IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CMFG LIFE INSURANCE COMPANY,
CUMIS INSURANCE SOCIETY, INC. and
MEMBERS LIFE INSURANCE COMPANY,

                        Plaintiffs,                    OPINION & ORDER

        v.
                                                       12-cv-037-wmc
RBS SECURITIES INC.,

                        Defendant.

In this civil action, plaintiffs CMFG Life Insurance Company and its subsidiaries (collectively, "CUNA Mutual") seek to rescind the purchase of fifteen residential mortgage-backed securities (RMBS) certificates sold to it by defendant RBS Securities ("RBS"). In August of 2013, this court ruled on various motions filed by both parties. Most important for purposes of this opinion, the court dismissed CUNA Mutual's claim for unjust enrichment and narrowed its rescission claim. The court also granted RBS's motion to strike CUNA Mutual's late expert disclosure of a "to-be-identified" CoreLogic employee, holding that CUNA Mutual (1) could not offer expert opinion testimony from a CoreLogic representative and (2) could not use anyone other than Jacqueline Doty (CoreLogic's Rule 30(b)(6) designee) as a non-expert witness for CoreLogic. (*See* Aug. 19, 2013 Opinion & Order (dkt. #245).)

Now before the court are the parties' latest volleys in what has become a markedly contentious case. RBS first sought clarification of the sanctions imposed upon CUNA Mutual. (Dkt. #266.) Soon thereafter, CUNA Mutual moved to vacate those sanctions and to assess sanctions against RBS for alleged improper *ex parte* contacts with CoreLogic

and interference with the relationship between CoreLogic and CUNA Mutual. (Dkt. #287.) Additionally, RBS has filed a new motion to dismiss CUNA Mutual's second amended complaint, arguing primarily that based on newly-disclosed trade confirmations, the court must apply *New York* law to this case and that under New York law, CUNA Mutual has failed to state a claim for rescission. (Dkt. #296.) Finally, the parties have filed cross-motions for summary judgment. (Dkt. ##343, 381.)[1]

For the reasons that follow, the court finds that New York law does not apply in this action. The court will also deny CUNA Mutual's motion to vacate its earlier opinion and order, both because the court sees nothing "improper" in RBS's alleged conduct and because that conduct does not justify (or even begin to explain) CUNA Mutual's violation of Rule 26(a)(2). That being said, the court also finds that its previous order did *not* foreclose CUNA Mutual from seeking to introduce the AVM values indirectly pursuant to Federal Rule of Evidence 703, through the testimony of expert Dr. Charles Cowan. Finally, the court will grant in part RBS' motion for summary judgment, eliminating CUNA Mutual's claims based on misrepresentation of compliance with underwriting guidelines and owner-occupancy rates. In light of these rulings, a status conference will be held on Tuesday, July 29, 2014, at 2:00 p.m. to discuss what remains to be tried in this matter.

---

[1] Various other, related motions are currently pending as well, which the court will also take up in this opinion.

BACKGROUND[2]

RBS is a Delaware corporation with its principal place of business in Connecticut. All of the CUNA Mutual plaintiffs are incorporated in Iowa and maintain their principal places of business in Wisconsin.

Between 2004 and 2007, CUNA Mutual purchased from RBS fifteen certificates representing the right to receive income from ten separate residential mortgage-backed securities, fixed-income securities that are backed by pools of residential mortgage loans. For each deal, RBS presented CUNA Mutual with various "offering documents" summarizing the characteristics of the securitized mortgage loans and describing the underwriting procedures the third-party loan originators used. Specifically, the offering documents disclosed the owner-occupancy rate; the loan-to-value ratio ("LTV"), which is calculated by dividing the loan amount by the market value of the property; a credit rating for each certificate; the combined loan-to-value ratio ("CLTV"), calculated by dividing the outstanding principal balance of all loans on the property by the market value; and the underwriting guidelines to which the originators adhered in approving the underlying mortgages.

At various times after CUNA Mutual purchased the RMBS certificates, the loans backing them began to default at high rates. Eventually, all ten RMBS either drastically underperformed or collapsed entirely. CUNA Mutual commissioned a forensic investigation of the loan pools to determine whether the offering documents RBS provided had been accurate. Specifically, CUNA Mutual conducted a retroactive valuation using an automated

---

[2] The court provides only this basic background information at the outset; all other facts will be discussed as necessary in the context of the resolution of each pending motion.

valuation model ("AVM") to test the represented LTV and CLTV ratios.  CUNA Mutual alleges that (1) the results revealed that RBS's representations in the offering documents were false or misleading, even at the time they were made, and (2) the actual quantitative characteristics of the loan pools would have shown they were far more likely to experience high default rates and high loss severities in foreclosure sales.  CUNA Mutual also alleges that its own "re-underwriting" of a random sample of the subject loans reveals that the third-party originators had systematically abandoned their underwriting standards when issuing the loans backing the RMBS that CUNA Mutual purchased.  CUNA Mutual alleges that but for these misrepresentations in the offering documents, it would not have purchased the certificates.

OPINION

## I.  RBS's Motion to Dismiss[3]

### A. The Previous Motion to Dismiss

CUNA Mutual originally brought suit in state court, seeking to rescind its purchase of the RMBS certificates on the grounds of misrepresentation.  RBS removed the action to this court.  CUNA Mutual eventually amended its complaint to add a claim for unjust enrichment, as an alternative basis for the equitable relief it sought.

On March 30, 2012, RBS moved to dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(6).  (*See* dkt. #32.)  For purposes of that motion, RBS "assume[d] without conceding that Wisconsin law applie[d]" to CUNA Mutual's claims.  (*See* Def.'s Br.

---

[3] For the purposes of the motion to dismiss, the court accepts as true all well-pled facts and allegations in the second amended complaint, drawing all reasonable inferences in favor of the plaintiffs. *London v. RBS Citizens, N.A.,*, 600 F.3d 742, 745 (7th Cir. 2010).

(dkt. #33) 8.)  Accordingly, the parties briefed the question of whether CUNA Mutual had stated a claim upon which relief could be granted applying Wisconsin law, with RBS itself advocating for the application of Wis. Stat. § 893.93(1)(b), the six-year statute of limitations for actions on the ground of fraud.  On August 19, 2013, the court granted in part and denied in part RBS's motion.  Specifically, it allowed CUNA Mutual to proceed with claims for rescission based on misrepresentation, but dismissed CUNA Mutual's claim for unjust enrichment given the contractual relationship between the parties.  Additionally, the court permitted CUNA Mutual to file a second amended complaint with respect to new factual allegations supporting its claim of rescission based on misrepresentation, including securities MMLT 2005-3, RAMC 2004-4 and RAMC 2005-4.

### B.  The Trade Confirmations and the Present Motion to Dismiss

In June of 2012, RBS requested that CUNA Mutual produce trade confirmations from its purchases of the certificates from RBS.  CUNA agreed to produce responsive documents, but did not do so until September of 2013.  The confirmations it eventually produced were originally created by RBS and sent to CUNA Mutual describing the transactions into which the parties had entered.  Each confirmation also contained a list entitled "Terms of Agreement."  The list began:

> It is agreed by and between you ("Customer" or "you") and Greenwich Capital Markets, Inc. ("RBS Greenwich Capital," "we", or "us") that each transaction as described on the face hereof (a "Transaction") is subject to the following terms and conditions:

(*See, e.g.*, Horowitz Decl. Ex. 4 (dkt. #299-4) 3.)  Term number 23 on the list read:

> This confirmation and all Transactions hereunder shall be governed by and construed in accordance with the laws of the

5

> State of New York (excluding choice or conflict of law doctrine) and all applicable federal laws and regulations.

(*E.g. id.*)   These same Terms of Agreement appear on all of the trade confirmations produced by CUNA Mutual thus far.   (*See id.* at 2-79.)

Accordingly, on October 22, 2013, RBS filed a renewed motion to dismiss pursuant to Rule 12(b)(6).   (Dkt. #297.)   Unlike its previous motion, in which RBS assumed Wisconsin law applied, RBS now argues that the trade confirmations CUNA Mutual recently produced as part of discovery establish that *New York* law governs the contracts between the parties.   RBS further asserts that under New York law:   (1) CUNA Mutual failed to plead that it lacked an adequate remedy at law; and (2) New York's statute of limitations renders CUNA Mutual's claims time-barred.   Additionally, RBS contends that CUNA Mutual has pled itself out of a rescission claim with respect to some of the certificates in this case because it could not have relied on documents it did not have. Finally, RBS seeks dismissal of CUNA Mutual's claims based on the alleged underwriting misrepresentations with respect to the RAMC 2004-4 and RAMC 2005-4 offerings, arguing that CUNA Mutual's second amended complaint ("SAC") still does not state plausible claims with respect to those offerings.

### i.   Application of New York Law

The majority of RBS's arguments in support of dismissal focus on the trade confirmations and the choice-of-law provision they contain.   RBS contends that these provisions make clear that New York law applies to this action, and that under New York law, a plaintiff must plead lack of adequate legal remedy in order to state a claim for equitable rescission.   CUNA Mutual disagrees, arguing that New York law permits rescission

claims even when a plaintiff has an adequate remedy at law.  The language of trade confirmations notwithstanding, there is little reason to delve deeply into New York law to resolve this dispute, since the court finds that New York law does not apply in this case,.

To begin with, it seems unlikely that Wisconsin choice-of-law rules *would* provide for the use of New York law in a financial transaction of this type, where Wisconsin has a substantial interest in protecting its own state citizens from deception in securities transactions.  While RBS is correct that Wisconsin law allows parties to contract for the law of a particular jurisdiction, the Wisconsin Supreme Court has explained that:

> this proposition is by no means unqualified.   Though we recognize that the party autonomy principle, i.e., permitting parties to stipulate the applicable law in the contract and honoring that stipulation, promotes certainty and predictability in contractual relations, . . . it cannot be permitted to do so at the expense of important public policies of a state whose law would be applicable if the parties['] choice of law provision were disregarded.

*Bush v. Nat'l Sch. Studios, Inc.*, 139 Wis. 2d 635, 642, 407 N.W.2d 883 (1987).  The court went on to explain in *Bush* that generally Wisconsin "statutes or common law which ... make a particular contract provision unenforceable ... are likely to embody an important state public policy." *Id.* at 643.  The Wisconsin Securities Act makes unenforceable any contracts that violate its provisions, Wis. Stat. § 551.509(11), and makes void any provision or condition purporting to waive compliance with the Act, *id.* at § 551.509(12).  Accordingly, enforceable choice-of-law rules would appear to call for Wisconsin law to apply in a case like the present one.

CUNA Mutual also points out that the trade confirmations are *not* the contracts it seeks to rescind.  That contract was actually formed between the parties on the date of the

sale. *See Adams v. Cavanagh Cmtys. Corp.*, 847 F. Supp. 1390, 1403 (N.D. Ill. 1994) (noting that the Seventh Circuit defines "sale" in the securities context as the time when the parties are committed to one another). The trade confirmations, CUNA Mutual argues, are post-hoc writings that have no legal import.

While CUNA Mutual's argument appears to have some merit, the court also need not and does not resolve this issue, because of a final, fundamental problem with RBS's argument. RBS's ostensible justification for the lateness of this procedural maneuver is that CUNA Mutual only recently produced the trade confirmations at issue -- a justification that rings hollow, given that *RBS itself* originally created and sent the trade confirmations. RBS attempts to gloss over this fact, claiming that it "conducted a reasonable search for trade confirmations" but could not find them, given that six to eight years have passed since the original purchases. (Def.'s Reply (dkt. #319) 4.) This may be true, but the court does not believe that RBS was *unaware* of the choice of law provision that it incorporated into *all* of the trade confirmations it sent, via what appears to be boilerplate "Terms of Agreement" language.

RBS also makes wholly speculative arguments that, if it had initially argued for the application of New York law based on the trade confirmations, CUNA Mutual "would have argued . . . that RBS had not met its burden to demonstrate that CUNA received the trade confirmations" and that even if RBS had located its own copies, CUNA Mutual "would have argued that there was no evidence it ever received them." (*Id.*) However, this does not justify RBS's apparent acquiescence in the application of Wisconsin law.

At a minimum, RBS should have *raised* the possible applicability of New York law in its first motion to dismiss. Its decision not to do so has resulted in two years of litigation

8

under Wisconsin law, with nary a hint that New York law might conceivably govern.  The court, therefore, finds this case similar to *Lott v. Levitt*, 556 F.3d 564 (7th Cir. 2009).  In *Lott*, after summary judgment was entered in favor of the defendant, the plaintiff moved for reconsideration, arguing for the first time that Virginia law, not Illinois law, applied.  The district court rejected that argument, finding that the plaintiff had waived it, and the Seventh Circuit agreed:

> The principle of waiver is designed to prohibit this very type of gamesmanship – Lott is not entitled to get a free peek at how his dispute will shake out under Illinois law and, when things don't go his way, ask for a mulligan under the laws of a different jurisdiction.

*Id.* at 568.  Though RBS seeks to distinguish the *Lott* case, arguing that it involved a plaintiff who explicitly acquiesced in the application of Illinois law, whereas RBS merely "assumed without conceding" that Wisconsin law applied, the court finds that distinction unpersuasive.  RBS briefed its Rule 12(b)(6) motion applying Wisconsin law, despite the choice of law provision that it created and included in its own trade confirmations.  The court declines to give RBS a "free peek" at how things "shook out" under Wisconsin law, only to allow it a second crack under New York law.   In essence, RBS is seeking reconsideration of the court's previous ruling on the motion to dismiss, but the court finds that the time to ask for New York law is past.[4]

---

[4] *Perry v. Sullivan*, 207 F.3d 379 (7th Cir. 2000), which RBS cites, is also distinguishable.  In that case, the Seventh Circuit found that a statute of limitations defense was not waived even when it had not been asserted in the defendant's motions to dismiss the first or second amended complaints.  The court noted that Rule 8(c) requires a party to affirmatively raise a statute of limitations defense in a responsive pleading, but that there is no requirement that a party raise all affirmative defenses before filing a Rule 12 motion.  Such a rule would not make sense, the court found, because Rule 12(b) motions serve to clarify a plaintiff's complaint, and "[r]equiring the defendant to plead all affirmative defenses before the complaint has been clarified would defeat the purpose of the pleading rules."  *Id.* at 382-83.  In contrast, here, RBS did not wait until after Rule 12 motions were resolved

### ii.    Reliance

RBS also argues pursuant that, with respect to particular RMBS, CUNA Mutual has not stated a claim on which relief can be granted for rescission based on misrepresentation. Specifically, it contends that now that CUNA Mutual has admitted that its contracts with RBS were formed on the date of purchase, it has failed to plead reliance for nine certificates for which prospectuses were not issued until after CUNA Mutual purchased them.  Because RBS advances this argument more fully on its motion for summary judgment, the court need not discuss it here.

### iii.    RAMC 2004-4 and RAMC 2005-4

Finally, RBS briefly argues that CUNA Mutual fails to state plausible claims of underwriting guideline violations with respect to RAMC 2004-4 and RAMC 2005-4, because of: (1) the limited information its SAC provides regarding originator Delta Funding, and (2) the limited reunderwriting it performed on the loans backing those deals.  This argument is intertwined with CUNA Mutual's motion for sanctions (dkt. #713) and, in any event, is rendered moot by this court's ruling on summary judgment (*see* discussion, *infra*), so the court need not address the plausibility of these particular claims as pled.[5]

---

to raise a Rule 8(c) affirmative defense; it waited to raise the potential application of an entirely different state's law, even though that choice of law determination was relevant to its original Rule 12 motion.

[5] The parties have also filed motions for judicial notice in arguing the 12(b)(6) motion.  (Dkt. ##298, 314.)  Because the court also takes up summary judgment in this motion, however, those motions are denied as moot.

## II. CUNA Mutual's Motion to Vacate Sanctions

### A. The Original Sanctions

On April 29, 2013, CUNA Mutual served RBS with an expert disclosure naming "[a] yet-to-be-identified corporate representative of CoreLogic, Inc. and CoreLogic Solutions" as a testifying expert on various topics surrounding CoreLogic's ValuePoint 4 retrospective AVM. (Milosavljevic Decl. Ex. E (dkt. #209-5).) Following that disclosure, both sides deposed Jaqueline Doty, CoreLogic's Rule 30(b)(6) representative. CUNA Mutual's counsel questioned Doty about each of the topics in its disclosure; RBS attempted to do the same, but Doty refused to answer several questions on the grounds that she would *not* be testifying as an expert at trial. RBS thereafter asked CUNA Mutual to withdraw its designation of CoreLogic as an expert witness, but CUNA Mutual refused. (*See id.* Ex. J (dkt. #209-10).)

On May 29, 2013, RBS brought a motion to strike CUNA Mutual's disclosure of CoreLogic, Inc. and CoreLogic Solutions LLC ("CoreLogic") as testifying experts and seeking to exclude that expert testimony, as well as the data generated by CoreLogic's AVM model. RBS also sought Rule 37 sanctions. Its grounds for doing so were twofold. First, RBS argued that CUNA Mutual had not identified any expert witness by name as required by Rule 26(a)(2)(A). Second, RBS faulted CUNA Mutual for failing to provide an expert report, given that CoreLogic was apparently going to be offering trial testimony. CUNA Mutual argued that it was not required to produce an expert report, because CoreLogic had not been "retained or specially employed" to provide expert testimony, but rather had been retained only as a "consulting expert" from whom no written report is required under Rule 26(a)(2)(B).

11

The court agreed with RBS.  First, it held that CUNA Mutual had violated Rule 26(a)(2)(A), which "undoubtedly requires disclosure of a specific individual by name." (Aug. 19, 2013 Opinion & Order (dkt. #245) 42.)  Accordingly, it precluded CUNA Mutual from offering any expert opinion testimony from CoreLogic at trial.  The court also found that while CoreLogic was *initially* retained only to consult, CUNA Mutual's "refusal to acknowledge the obvious -- that it *now* [sought] to offer CoreLogic's testimony as a specially retained expert – ha[d] caused needless expense for its opponent" and had wasted the time of the court.  (*Id.* at 42-43.)  Additionally, the court held that, in light of CoreLogic's refusal to act as a testifying expert and CUNA Mutual's own failure to name a specific witness, CUNA Mutual's "refusal to withdraw its expert designation was inexcusable" and that RBS had been prejudiced by an inability to prepare fully for summary judgment.  (*Id.* at 44-45.)  Accordingly, as an additional sanction, it held that CUNA Mutual was precluded from using anyone other than Doty as a non-expert witness for CoreLogic and required that CUNA Mutual reimburse RBS for its attorney's fees and costs connected to the motion to strike.

### B.  CUNA Mutual's Current Motion

On October 8, 2013, CUNA Mutual filed a motion to vacate the sanctions previously imposed and to assess sanctions against RBS.  (Dkt. #287.)  Its basis was alleged "improper contacts" between RBS and CoreLogic, which CUNA Mutual argued had interfered with CUNA Mutual's relationship with CoreLogic and had ultimately resulted in CoreLogic refusing to provide a testifying expert.  Specifically, CUNA Mutual pointed to: (1) e-mails in October 2012, in which Kirkland & Ellis partner William Pratt contacted

CoreLogic's Deputy General Counsel, Thomas Graber, seeking information as to CoreLogic's AVM products and their appropriate uses; (2) communications in April 2013 in which RBS inquired into CoreLogic's relationship with CUNA Mutual; and (3) e-mails immediately after CUNA Mutual's disclosure of an unnamed CoreLogic testifying expert, in which Kirkland & Ellis lawyer Alex Pilmer asked CoreLogic whether it would be testifying and, when Graber expressed surprise at the disclosure, asked CoreLogic to advise CUNA Mutual that it would not be providing expert testimony.

CUNA Mutual argues that RBS's communications with CoreLogic constituted *ex parte* contacts "about substantive aspects of this litigation that fall directly within Rule 26," which limits how and what attorneys obtain in discovery from designated testifying and non-testifying experts during the course of litigation.  Fed. R. Civ. P. 26(b)(4).  Essentially, CUNA Mutual argues that RBS wrongfully "undermined CUNA Mutual's relationship with CoreLogic," causing CoreLogic to decline to produce a testifying expert.  Based on this conduct, CUNA Mutual asks that the court vacate the sanctions imposed upon it for failing to make a proper expert disclosure and requests that the court: (1) deny RBS's motion for clarification, which seeks to preclude CUNA Mutual from using the AVM values; (2) bar RBS from using testimony from Doty's deposition; and (3) award CUNA Mutual its reasonable costs and attorney's fees incurred in investigating RBS's contacts with CoreLogic and filing related motions and responses.

In order to determine whether the contacts of which CUNA Mutual complains warrants the imposition of sanctions, the court reviews each incident of contact that allegedly undermined CUNA Mutual's relationship with CoreLogic (and, presumably, its ability to find a CoreLogic testifying expert).  The contacts began in October 2012, when

RBS attorney Alexander Pilmer e-mailed Thomas Graber, the deputy general counsel for CoreLogic, and explained that he represented RBS Securities in a series of cases involving RMBS. Pilmer said that several plaintiffs, CUNA Mutual among them, were relying on CoreLogic's ValuePoint 4 AVM to support allegations about allegedly inflated appraisals and owner-occupancy rates, and stated:

> We are interested in learning more about CoreLogic's AVM products (specifically ValuePoint 4) and what the appropriate uses of that product are. Also, we are interested in understanding what other CoreLogic AVM products might exist with respect to retrospective valuations, and whether they can be used in a litigation context.

(Pl.'s Br. Supp. Mot. Vacate Sanctions Ex. R (dkt. #289-18) 3.) In response, Graber stated, "[W]e do not typically comment on matters related to work we have performed for a client." (*Id.* at 2.)

In April 2013, CUNA Mutual apparently learned that RBS was seeking discovery materials directly from CoreLogic. On April 10, 2013, CUNA Mutual attorney Michael Klenov sent an e-mail to RBS's counsel, requesting that they cease trying to acquire those materials. It also seems that RBS's counsel agreed. (*See id.* at Ex. I (dkt. #289-9) 3.) On April 17, 2013, Klenov sent a second e-mail asking RBS's counsel to cease its attempts to acquire communications between CUNA Mutual and CoreLogic. RBS attorney Derek Milosavljevic again agreed, but also indicated that RBS had asked CoreLogic at a meet-and-confer whether it was retained as a non-testifying expert consultant, and said that CoreLogic's attorney "informed [RBS] that CoreLogic does not consider itself to have been retained in that capacity." (*Id.* at 1-2.)

As previously mentioned, CUNA Mutual filed its expert disclosure of a yet-to-be-identified CoreLogic employee on April 29, 2013. On April 30, RBS's counsel Pilmer e-mailed CoreLogic's counsel Graber the following:

> Tom – I've attached CUNA Mutual's Rule 26(a)(2)(C) disclosure delivered to us last night. You'll see that CUNA has disclosed CoreLogic as presenting expert testimony regarding ValuePoint4, its accuracy, and … its application to the ten RMBS at issue in this case. This looks to be a materially different position than what you and I discussed last week. If CUNA's statement is true, then we will need to push forward swiftly with all aspects of our outstanding subpoena.

(*Id.* at Ex. T (dkt. #289-20) 2.) Graber responded:

> This came as a surprise. There is no change in our position as described in the Doty affidavit, which was also provided to plaintiffs['] counsel.

(*Id.*) Later that same day, Pilmer sent another e-mail asking CoreLogic "to advise CUNA in writing (copied to us) that it will not be providing expert testimony in this case" and providing a sample paragraph that CoreLogic could send. On May 3, CoreLogic did indeed send a letter refusing to make a trial witness available to CUNA Mutual. (*See id.* at Ex. P (dkt. #289-16).)

Taken together, CUNA Mutual argues these contacts demonstrate unethical conduct by RBS that undermined CUNA Mutual's relationship with CoreLogic. While it certainly appears that the relationship between CUNA Mutual and CoreLogic has splintered, the court does not believe that the breakdown is attributable to any improper conduct on RBS's part. There are two justifications for the rule prohibiting *ex parte* contacts with opposing experts: (1) "the expert may have confidential information that should be protected from the adversary" and (2) "the Federal Rules of Civil Procedure heavily regulate the use of

15

experts." *Tidemann v. Nadler Golf Cart Sales, Inc.*, 224 F.3d 719, 724 (7th Cir. 2000). In reviewing the communications to which CUNA Mutual objects, however, neither of these justifications warrants imposing sanctions on RBS.

Taking first the issue of confidential information, none of those contacts sought to elicit confidential information related to this litigation. First, in the October 2012 communications, which took place between October 3 and 10, RBS sought to learn more about the ValuePoint 4 AVM and its uses generally, not, as CUNA Mutual represents, to learn about "CoreLogic's work for CUNA Mutual for purposes of this specific litigation." (*See* Pl.'s Br. Supp. Mot. Vacate Sanctions Ex. R (dkt. #289-18) 3.) Furthermore, it is undisputed that CoreLogic divulged nothing at this time, even with regard to RBS's general questions. *Cf. Cramer v. Sabine Transp. Co.*, 141 F. Supp. 2d 727, 732 (S.D. Tex. 2001) ("Plaintiff does not allege that any confidential information, or any specific information at all beyond vague generalities, was in fact shared. This significantly undermines Plaintiff's request for disqualification.") (citing *Tidemann*, 224 F.3d at 724).

Next, in March of 2013, RBS served a subpoena on CoreLogic directly, seeking the license agreement and communications between the parties. When CUNA Mutual objected, RBS then agreed not to seek directly from CoreLogic material that CUNA Mutual claimed was privileged (material which CUNA Mutual apparently produced thereafter without objection). Rather than "promptly breaking" this promise, as CUNA Mutual represents, RBS next inquired, during a meet-and-confer, as to whether CoreLogic *was,* in fact, CUNA Mutual's retained non-testifying expert. (*See* Pl.'s Br. Supp. Mot. Vacate Sanctions Ex. I (dkt. #289-9) 2.) This is apparently the only disclosure during that meet-and-confer to which CUNA Mutual objects, and the court does not find RBS's inquiry

16

improper, since RBS's question was simply whether CoreLogic was or was not CUNA Mutual's expert.

Even assuming that CoreLogic's "expert status" is, as CUNA Mutual represents, work-product-protected, CUNA Mutual cannot credibly argue that it had any expectation of confidentiality in that status, given that CUNA Mutual represents that it had "repeatedly informed RBS that CoreLogic was its consulting expert" since 2012.  (Pl.'s Br. (dkt. #289) 4; *see also, e.g.*, *id.* at Ex. H (dkt. #289-8) 2 (representing CoreLogic as a "non-testifying expert consultant[]").)  Thus, to the extent that CoreLogic's "status" (rather than its expert opinions or facts of which it was aware) was protected work product, CUNA Mutual itself *informed* RBS of that "status," apparently on multiple occasions, and waived any expectation of confidentiality it had in that piece of information.

Finally, on April 30, 2013, after receiving CUNA Mutual's disclosure of an unidentified "corporate representative of CoreLogic" as a testifying expert, RBS again sought to determine what CoreLogic's role actually was in the litigation.  This is unsurprising, given that in the months leading up to this disclosure, CUNA Mutual had consistently represented that CoreLogic was its *non-testifying* expert.  Indeed, CoreLogic itself responded that CUNA Mutual's disclosure of it as a testifying expert "came as a surprise." (*Id.* at Ex. T (dkt. #289-20) 2.)  While RBS may have gone too far in drafting a response that CoreLogic could use to inform CUNA Mutual that it would not be providing a testifying expert, the court is not convinced that RBS "undermined" the relationship between CoreLogic and CUNA Mutual by doing so.  On the contrary, CUNA Mutual's own, apparently unauthorized representations regarding the scope of CoreLogic's role in this lawsuit, which appears inconsistent with CoreLogic's written retention agreement, appears

17

responsible for any breakdown in their relationship.[6]  Overall, none of the conduct CUNA Mutual identifies appears to have undermined, or even attempted to undermine, the confidentiality of any protected information related to this lawsuit.

As noted above, the second justification for prohibiting *ex parte* contacts between an expert and counsel is to prohibit "workarounds" with regard to the Federal Rules of Civil Procedure, which heavily regulate discovery from experts.  Here, CUNA Mutual invokes Federal Rule of Civil Procedure 26(b)(4)(D), which requires the party seeking information to show "exceptional circumstances" before it can discover facts known to or opinions held by a consulting expert, other than by formal deposition.  "The rule is designed to promote fairness by precluding unreasonable access to an opposing party's diligent trial preparation." *Durflinger v. Artiles*, 727 F.2d 888, 891 (10th Cir. 1984).  CUNA Mutual does not and cannot suggest that the contacts it identifies had any relation to its "diligent trial preparation."  Only the subpoenas that RBS served on CoreLogic could potentially bear on the substantive aspects of this litigation, and both parties agree that RBS not only withdrew those subpoenas, but also sought and received the materials in question directly from CUNA Mutual thereafter.  CUNA Mutual's attempt to characterize this as "increas[ing] pressure" on CoreLogic has no support in the record before this court, and the court declines to presume nefarious motives on such scant evidence.

The fact that RBS contacted CoreLogic's counsel, albeit *in-house* counsel, further mitigates any potential problems with its conduct.  This is not a case in which a lawyer contacts the individual expert himself, seeking to undermine the expert's loyalties or acquire

---

[6] This is not to say that the inquiry by RBS's counsel may not have pushed CoreLogic along, but rather that from the beginning CoreLogic almost certainly had no interest in acting as a testifying expert for its own business reasons and tht CUNA Mutual was willing to live with that ambiguity.

information about the other parties' litigation strategy or the expert's plans to testify. Rather, this case features conversations between lawyers who have the shared goal of determining what role, if any, CoreLogic was playing on CUNA Mutual's behalf.  While CUNA Mutual is technically correct that Rule 4.2, which generally allows communications with a *corporate opponent's* in-house counsel, does not on its face apply to these circumstances, the rationale -- that it is unlikely in-house counsel will inadvertently make harmful disclosures -- is nevertheless applicable.[7]

Additionally, the court notes that to the extent RBS was somewhat at fault, its culpability does not justify the relief of discovery violations for which CUNA Mutual was originally responsible and properly sanctioned.  The contacts between CoreLogic and RBS have *no bearing* on CUNA Mutual's failure to: (1) disclose the name of a specific, testifying expert witness from CoreLogic; (2) provide an expert report in connection with that purported testifying expert; and (3) withdraw the designation, even after CoreLogic explicitly refused to provide CUNA Mutual with a testifying expert.  To state it another way, the misconduct of which CUNA Mutual accuses RBS has absolutely no impact on the seriousness of its own violations.  If anything, it was CUNA Mutual's failure to be forthcoming that prompted RBS's extraordinary efforts to determine CoreLogic's actual role

---

[7] The case CUNA Mutual cites in support of its argument that even communications with an expert's lawyer are improper, *American Protection Insurance Company v. MGM Grand Hotel-Las Vegas*, Nos. Civ.-LV-82-26 HEC, LV-82-96 HEC, 1983 WL 25286 (D. Nev. Dec. 8, 1983), is factually inapposite.  In *MGM Grand*, Morris, a paid consultant to the MGM Grand, had his attorney approach opponent's counsel, Cozen, to enter into a service contract.  Thereafter, multiple telephone conversations between Morris, his lawyer and Cozen occurred, after which time Cozen managed to induce Morris, via the offer of large sums of money, to defect from MGM Grand in order to take advantage of his "knowledge and expertise."  No such improper behavior occurred here, and the result in that case was in no way premised on the initial contacts between Cozen and Morris' lawyer.

in this lawsuit.  The court, therefore, declines to free CUNA Mutual from sanctions that it certainly earned.[8]

Finally, while CUNA Mutual's frustration with CoreLogic's refusal to testify is understandable, CUNA Mutual itself and perhaps CoreLogic, not RBS, are responsible for that frustration.  Based on its license agreement with CoreLogic, which CUNA Mutual has produced, CUNA Mutual had the right to expect CoreLogic to stand behind its commercial services, including providing a witness to explain and defend its methodology, but had not explicitly retained CoreLogic to provide affirmative expert opinion or testimony with respect to this or any other pending lawsuit.  (*See* Milosavljevic Decl. Ex. A (dkt. #281-1) 11.)  The current record, therefore, suggests that CoreLogic's defection is less a product of pressure by RBS and more of its own desire to offer commercial "services" to as many financial institutions as possible, while avoiding the inherent conflicts in testifying adversely to any of those clients.  Regardless, CoreLogic's repudiation of any arguable duty to provide expert opinion testimony does not justify imposing sanctions on RBS.

### III.  RBS's Motion for Clarification

The court next briefly addresses RBS's motion for clarification (dkt. #266) regarding the extent to which CUNA Mutual may introduce the AVM data at trial.  RBS asks the court to clarify that the sanctions it imposed upon CUNA Mutual were intended to preclude the introduction of those values entirely.  In its original Opinion and Order, however, the court also described the situation surrounding the CoreLogic data as follows:

> There would appear two ways in which CUNA Mutual can present the CoreLogic data to the fact-finder: (1) directly

---

[8] Insofar as CUNA Mutual invokes the doctrine of unclean hands, the court reiterates that it does not find RBS's arguable misconduct to rise anywhere near CUNA Mutual's.

through the testimony of a CoreLogic employee, or (2) indirectly through the testimony of an expert witness's opinions under Federal Rule of Evidence 703. RBS does not appear to challenge CUNA Mutual's *right* to introduce the data through Rule 703, and CUNA Mutual takes care in arguing that it has preserved this right. Instead, RBS's motion to strike focuses entirely on the possibility that CUNA Mutual may seek to introduce expert witness opinion testimony from a CoreLogic employee. RBS argues that this option should be barred because CUNA Mutual has not disclosed a CoreLogic expert in compliance with Federal Rule of Civil Procedure 26. The court agrees.

(Aug. 19, 2013 Opinion & Order (dkt. #245) 40.)

In a footnote, the court declined to rule on the admissibility of the model data themselves, "whether offered as information relied upon by its expert under Rule 703 or introduced through a fact witness." (*Id.* at 40 n.16.) Therefore, as articulated in the original opinion, CUNA Mutual is free to seek to admit its AVM values as facts or data on which one of its disclosed experts in this field would reasonably rely, pursuant to Federal Rule of Evidence 703. That question arises, in fact, in the context of RBS's motion to exclude certain of CUNA Mutual's expert opinions, to which the court now turns.

## IV.  Motion to Exclude Valuation Opinions of Dr. Charles Cowan

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), RBS moves to exclude the valuation opinions of Dr. Charles Cowan (dkt. #379). CUNA Mutual proposes to offer Cowan's testimony to support its theory that RBS misrepresented the LTV and CLTV ratios of the loans underlying the RMBS.[9]  If

---

[9] The "loan-to-value," or "LTV," ratio is the amount loaned compared to the value of the property serving as collateral. The "combined loan-to-value," or "CLTV," ratio is the amount of all loans secured by the collateral property, including third-party liens, compared to the value of the collateral. The parties dispute whether these ratios represent objective calculations, as well as whether they were offered by RBS or by independent third parties.

21

permitted, Cowan would opine, among other things, that appraisals of the underlying properties were artificially inflated, resulting in understated LTV and CLTV ratios.[10]

To support this opinion, CUNA Mutual employed CoreLogic's ValuePoint 4 automated valuation model, or AVM, to generate alternative value estimates. An AVM is a computer software program that draws on data about comparable properties from databases selected by the AVM provider and then applies an algorithm to estimate the value of a particular property at a particular time. Dr. Cowan then purports to have performed statistical analyses of the original appraised values in light of the AVM-generated value estimates and concluded that the values used to calculate the LTVs and CLTVs were biased in the direction of overvaluation to a 95% statistical likelihood.

As noted above, RBS moves to exclude his opinions under Federal Rule of Evidence 702 and *Daubert*. Pursuant to Rule 702, expert testimony is admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[10] Dr. Cowan was retained to complete three tasks: (1) selecting statistically valid random samples from the loan pools so Ira Holt could "re-underwrite" them; (2) extrapolating these underwriting results to the populations of loans from which the samples were drawn; and (3) statistically analyzing the AVM results and commenting on whether the results are indicative of systemic inflation of appraised property values. (*See* Charles Cowan Report (dkt. #214) ¶ 1.) RBS challenges only the third category of opinions in its motion.

Fed. R. Evid. 702.  This rule imposes a special obligation on a trial judge to ensure that all expert testimony is not only relevant, but reliable.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

Reliability is "primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced."  *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013).  "An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt.  It is the role of the jury to weigh these sources of doubt."  *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013).  Based on those principles, the Seventh Circuit has held that "arguments about how the selection of data inputs affect[s] the merits of the conclusions produced by an accepted methodology should normally be left to the jury."  *Manpower*, 732 F.3d at 808.

Given the above, many of RBS's arguments necessarily fail.  First, RBS argues that Dr. Cowan is not qualified to opine on the accuracy of real estate appraisals because he lacks training, experience or certification in appraisal and in the creation of AVMs.  But this reasoning assumes that Dr. Cowan is testifying as an expert in those fields.  He is not.  His opinion is based on his specialized knowledge as a statistician (a discipline in which RBS does not dispute he is qualified), rather than on individual real estate appraisals or on AVM algorithms.  If anything, RBS's argument seems to imply that a statistician must be an expert not only in statistics but also in the subject matter underlying the data he analyzes.  Neither Rule 702 nor *Daubert* sets such a high bar.

Next, RBS asks the court to exclude the valuation opinions because Dr. Cowan is impermissibly serving as the "mouthpiece of a scientist in a different specialty."  *Dura Auto.*

*Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002).  In RBS's view, the fact that Dr. Cowan relies on the AVM outputs in performing his analysis means he is vouching for the accuracy of those outputs, which he is not qualified to do.  RBS points in particular to *Dura* as support.  In that case, the Seventh Circuit concluded that a hydrogeologist who was not himself an expert in mathematical models of groundwater flow could not testify to the accuracy of his assistants' flow modeling.  The assistants' modeling was based upon two models, QuickFlow and SLAEM, which were generally employed to model *current* groundwater flow; the assistants instead used them to model flow in the 1970s.  That unusual application necessitated "adapting the models," which in turn "required a host of discretionary expert judgments" to which the hydrogeologist himself could not testify. *Dura,* 285 F.3d at 615.  Thus, the Seventh Circuit concluded that the hydrogeologist "was not competent to opine" on the flow modeling, and without it, there was no foundation for him to testify as to his *own* opinions.  *Id.*

       In so holding, however, the Seventh Circuit further explained that "[h]ad Dura merely wanted to use SLAEM and QuickFlow to determine the *current* capture zone, . . . we might well have a different case; such use might be quite routine."  *Id.* (emphasis added). The court believes this case is distinguishable from *Dura* on this basis: here, unlike *Dura*, there has been no "tweaking" of the AVM tool itself to alter its ordinary functions.  Dr. Cowan certainly cannot opine that the AVM outputs themselves are *correct*; he lacks the qualifications to offer such an opinion.  However, Dr. Cowan may use the AVM outputs to perform a statistical analysis, so long as he employs a reliable methodology in that analysis. *See, e.g., Manpower*, 732 F.3d at 809 ("Whether Sullivan selected the best data set to use, however, is a question for the jury, not the judge."); *Stollings*, 725 F.3d at 766-67 (judge

erred by excluding expert testimony on the grounds that one of expert's inputs was "not sufficiently reliable"); *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (district court properly allowed expert to calculate discounted present value of lost future earnings based on financial data furnished by party and assumptions furnished by counsel). If the data set itself is faulty, that provides RBS with substantial fodder for cross-examination and, ultimately, argument, but that flaw goes only to the weight of Dr. Cowan's conclusions. It does not make him a "mouthpiece" for CoreLogic.

RBS makes an additional, stronger argument with respect to Dr. Cowan's opinions that really goes to the heart of its objection to the AVM outputs as well: RBS argues that the outputs themselves are inadmissible and thus Dr. Cowan's opinions fail for lack of foundation. *Cf. Dura,* 285 F.3d at 615 (expert "was not competent to opine on fhe first issue, and without an expert opinion on that issue Dura could not get to the second"). As noted above, after imposing discovery sanctions on CUNA Mutual for its noncompliance with Fed. R. Civ. P. 26, the court previously left open the possibility that CUNA Mutual might nevertheless be able to introduce the AVM outputs "indirectly through the testimony of an expert witness's opinions under Federal Rule of Evidence 703." (Aug. 19, 2013 Opinion & Order (dkt. #245) 40.) At that time, it reserved ruling on the indirect admissibility of the data under Rule 703. (*Id.* at 40 n.16.)

While RBS now argues that the AVM outputs are *not* data upon which an expert would reasonably rely, it also concedes having itself used ValuePoint4 to produce *current* property value estimates. (Def.'s Br. Reply Mot. Exclude Cowan Opinions (dkt. #646) 5.) Still, RBS argues that it never used ValuePoint4 for *retrospective* estimates, as CUNA Mutual and its expert would in this suit. RBS further argues that CoreLogic has itself indicated that

its users "should not . . . rely solely on CoreLogic (or other) AVMs to make reliable determinations of the reasonableness of value opinions offered by licensed or certified appraisers, whether individually or collectively." (Derek M. Milosavljevic Decl. Ex. A (dkt. #225-1) ¶ 3 (Jacqueline Doty affidavit).)

CUNA Mutual argues in response that using an AVM to produce current value estimates versus retrospective estimates is a distinction without a difference, particularly because a CoreLogic study found that retrospective AVMs may be *more* accurate than the original AVMs. (*See* dkt. #382-7.) CoreLogic has also advised its users in a white paper entitled "Using Baseline AVM Statistics to Mitigate Risk" that, given a sufficiently large sample size, "AVM statistics can also be used by traders to quickly detect systemic bias in pool valuations." (*See* dkt. #306-1.) Indeed, in assessing the subprime mortgage crisis, CoreLogic apparently compared its AVM values to original valuations as part of an analysis concluding that "as the likelihood of valuation misrepresentation increases, so does incidence of poorer credit performance." (*See* dkt. #512-1, at 12.) Because Dr. Cowan's report uses AVM data in a similar manner -- that is, statistically analyzing a large pool of loans to assess the likelihood of systemic bias -- CUNA Mutual contends that those AVM data are proper under Rule 703.

Provided that it can lay the requisite foundation, the court agrees that CUNA Mutual can offer Dr. Cowan's testimony. Of course, to lay that foundation, CUNA Mutual will have to provide testimony as to what it retained CoreLogic to do and what information was provided by CoreLogic. In response, RBS may both attack CUNA Mutual's and Cowan's confidence in the meaning of the AVM data absent direct testimony from CoreLogic and seek to draw out evidence that a statistician like Dr. Cowan would *not*

reasonably rely on AVM outputs in conducting an analysis designed to reveal systemic bias.[11]

Finally, RBS contends that Dr. Cowan did not review sufficient facts or data to offer his opinions, as Rule 702 requires. Specifically, RBS points out that: (1) Dr. Cowan does not know the algorithm, equation, variables or coefficients that CoreLogic's AVM uses; and (2) Dr. Cowan does not know what data the AVM itself employed in arriving at its estimates of value. While also a fair criticism, this again is an attack on the "quality of the data used in applying the methodology," not an attack on Dr. Cowan's methodology itself. *Manpower*, 732 F.3d at 806. RBS has presented no evidence that Dr. Cowan's *statistical analysis* is flawed in any way. Its sole contention is that Dr. Cowan did not use reliable data inputs in conducting that analysis. "[T]he Supreme Court and [the Seventh] Circuit have confirmed on a number of occasions that the selection of the variables to include in a regression analysis is normally a question that goes to the probative weight of the analysis rather than to its admissibility." *Id.* at 808 (collecting cases). Thus, "[w]hether [Cowan] selected the best data set to use . . . is a question for the jury" or, in this case, the court at trial. *Id.* at 809. Accordingly, the motion to exclude Dr. Cowan's valuation opinions is denied.

---

[11] Certainly, RBS has made clear that an analyst would not use a single AVM output for an individual property to show that particular property was overvalued. But as CUNA Mutual points out, Dr. Cowan analyzed more than 16,000 loans to assess general trends, rather than to opine that each and every property was overvalued. This does not necessarily mean that the AVM values themselves are admissible. Rule 703 states that if "facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Because the parties have not raised this question, the court declines to address the independent admissibility of specific values at this time.

## V.  Summary Judgment

Finally, the court takes up the parties' cross-motions for summary judgment.  RBS seeks summary judgment on the case in its entirety, arguing that CUNA Mutual failed to produce evidence on key elements of its claim for rescission and cannot prevail at trial.  CUNA Mutual seeks only partial summary judgment, asking the court to declare that certain disclaimers in RBS's offering documents are void and that RBS may not rely on them to disprove its liability.

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the initial burden is met, for an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'"  *Id.* at 323.

**A.  RBS's Motion for Summary Judgment**

   **i.    Scope of CUNA Mutual's Remaining Claims**

   Before determining whether there exists a genuine dispute of material fact, the court will briefly clarify the scope and nature of CUNA Mutual's remaining claims in this lawsuit. In ruling on RBS's first motion to dismiss, the court permitted CUNA Mutual to proceed on claims for contractual rescission grounded on misrepresentations that RBS allegedly made with respect to: (1) owner-occupancy statistics; (2) LTV and CLTV ratios; and (3) the loan originators' compliance with their own underwriting standards.  (*See* Aug. 19, 2013 Opinion & Order (dkt. #245) 10-28.)  The court granted RBS's motion to dismiss with respect to CUNA Mutual's claim for unjust enrichment and its claim for rescission based on misrepresentation of the RMBS's credit ratings.  (*Id.* at 20-21, 28-29.)  As previously explained, that same order also permitted CUNA Mutual to amend its complaint to add factual allegations supporting its surviving rescission claims, but it denied CUNA Mutual's request to add a new claim for rescission based on mistake.  (*Id.* at 34-38.)

   The parties now disagree as to whether CUNA Mutual has a *separate* cause of action for rescission based on misrepresentations as to RBS's own due diligence.  Specifically, CUNA Mutual now seeks to rescind its purchases of the RMBS because RBS allegedly misrepresented that it performed extensive due diligence on all of its offerings, including "re-underwriting" loans and validating appraisals.  According to CUNA Mutual, these misrepresentations are "independently actionable" and provide another basis to rescind its purchases of the RMBS in this case.

29

RBS argues that CUNA Mutual has never before sought to rescind on the basis that RBS misrepresented the extent of its due diligence efforts.  Rather, it points to this court's own recognition in its order on the first motion to dismiss that CUNA Mutual's allegations with respect to RBS re-underwriting the loans "appear[ed] to be more of an allegation of one of the ways RBS vouchsafed the accuracy of its substantive misrepresentations," rather than an independent theory of relief.  (*Id.* at 11 n.7.)  Because parties cannot amend their complaint through arguments in a brief opposing summary judgment, *Grayson v. O'Neill,* 308 F.3d 808, 817 (7th Cir. 2002), RBS asks the court to preclude CUNA Mutual from asserting this purportedly new basis for rescission.

"A party may not raise a claim at summary judgment if it did not provide notice of the claim in the pleadings as required by Fed. R. Civ. P. 8."  *Wis. Interscholastic Athletic Ass'n v. Gannett Co., Inc.*, 716 F. Supp. 2d 773, 783 (W.D. Wis. 2010).  The first amended complaint ("FAC"), at least, does not allege misrepresentations about RBS's due diligence procedures as a *separate* basis for contractual rescission.  (*See* 1st Am. Compl. (dkt. #29) ¶¶ 1-9 (summarizing nature of action and alleging RBS falsely represented "quantitative loan characteristics [LTV/CLTV ratios and owner-occupancy rates], favorable ratings, and adherence to underwriting standards when it sold the fifteen certificates at issue to CUNA Mutual").  Rather, as this court recognized in its order, CUNA Mutual pointed to RBS's due diligence-related representations to justify its reliance on RBS's *other* representations. (*See id.* at ¶ 306.)  Thus, the FAC does not provide notice of a due diligence-based claim sufficient to permit CUNA Mutual to raise it at summary judgment.

On the other hand, the Second Amended Complaint *does* add additional detail with respect to RBS's alleged misrepresentations regarding the extent of its due diligence process.

(*See, e.g.*, 2d Am. Compl. (dkt. #257) ¶ 34 ("In entering into any RMBS transaction with RBS – including every transaction at issue in this case – CUNA Mutual thus relied on RBS's representations that (1) RBS performed thorough due diligence on every RMBS that it offered for sale, (2) RBS re-underwrote a sufficient sample of the loans in the underlying loan pools to ensure that the loans in the pools had been issued in compliance with the originators' underwriting standards, and (3) RBS cured any defects it identified through re-underwriting.").)   Still, as in the FAC, these allegations appear calibrated not to create a separate cause of action for misrepresentations of RBS's due diligence efforts but instead to justify CUNA Mutual's reliance on *other* representations.   For example, in the first cause of action, the SAC explicitly states that RBS "represented to CUNA Mutual that as part of its due diligence process, it independently re-underwrote a portion of the mortgage pools . . . to confirm the accuracy of the quantitative representations and the representations about the Originators' adherence to their stated underwriting standards." (*Id.* at ¶ 876.)   With respect to each individual certificate, CUNA Mutual's allegations related to due diligence are likewise offered as a *reason* that Prusha relied on RBS's representation that loans were originated in compliance with underwriting guidelines, rather than misrepresentations in their own right.   (*See id.* at ¶¶ 262, 306, 354, 391, 447, 487, 524, 556, 597, 621.)   Indeed, CUNA Mutual itself stated, in briefing the motion to file its SAC, that its "due-diligence allegations serve principally to provide context for why RBS's mere solicitation of CUNA Mutual's investment in RMBS necessarily represented to CUNA Mutual that the loans backing the RMBS complied with originators' underwriting guidelines."   (*See* Pl.'s Reply (dkt. #197) 28-29.)   Thus, CUNA Mutual concluded, it need not have pled facts related to RBS's due diligence with particularity.

Furthermore, RBS is correct that CUNA Mutual has never before argued this theory provides an independent basis for rescission on the grounds of misrepresentation.  As a starting point, of course, there is CUNA Mutual's brief, which states that the due diligence-related representations are *not* the basis for its rescission claims.  (*See id.*)  Additionally, however, this court narrowed as a matter of law the scope of CUNA Mutual's rescission claims in its previous order on RBS's first motion to dismiss and likewise did not recognize an independently actionable claim for rescission based on misrepresentation of due diligence efforts.  (*See* Aug. 19, 2013 Opinion & Order (dkt. #245) 11 & n.7.)  When granting permission for CUNA Mutual to file its SAC, the court permitted the partial amendment in reliance on CUNA Mutual's assurances that it was using new allegations to "incorporate newly discovered evidence that buttresses [its] previous allegations and undermines many of the arguments RBS made in its motion to dismiss."  (*Id.* at 34 (quoting Pl.'s Br. Supp. Mot. Am. (dkt. #181) 1.)

At the same time, the court denied CUNA Mutual's attempt to add a new legal theory, on the basis that CUNA Mutual should have added that legal theory sooner.  (*Id.* at 37-38.)  Thus, nothing in the court's opinion granted leave for CUNA Mutual to add a new, independent theory of liability in its SAC -- particularly one that CUNA Mutual itself indicated it did not need to plead with particularity, since it was meant only to provide "context."  That CUNA Mutual moved for clarification and reconsideration of the opinion on two issues soon afterward but did *not* ask for leave to add a theory that RBS misrepresented its due diligence process (*see* dkt. #255) further supports this court's conclusion that CUNA Mutual has not allegedly an independent claim for rescission based on false representations of its due diligence.

32

As noted above, however, there were at least a few allegations relating to RBS's representations regarding its due diligence process. While the court does not believe CUNA Mutual adequately raised this theory as one that was *independently actionable*, in an abundance of caution, the court will address this theory as part of its summary judgment discussion as well.

### ii. Overview of Facts[12]

Plaintiff CMFG Life Insurance Company is an Iowa financial services firm with its headquarters in Madison, Wisconsin. CUMIS Insurance Society, Inc. is an Iowa property and casualty insurance company with its headquarters in Madison, Wisconsin. MEMBERS Life Insurance Company is an Iowa life and disability insurance company with its headquarters in Madison, Wisconsin; both CUMIS and MEMBERS are indirect, wholly-owned subsidiaries of CMFG. For ease of reference, these entities are collectively referred to as "CUNA Mutual," a group that sells approximately 240 different products to credit unions and their 95 million members, including various types of insurance and loans.

CUNA Mutual has an investment arm known as MEMBERS Capital ADVISORS ("MEMBERS Capital"). MEMBERS Capital invests in various vehicles, including public securities, RMBS, U.S. treasuries, corporate bonds and municipal bonds. MEMBERS Capital also provides investment advisory services to all entities within CUNA Mutual.

---

[12] Unless otherwise noted, the facts in this section are derived from the parties' proposed findings of fact, and are material and undisputed for the purposes of resolving RBS's motion for summary judgment. Due to the volume of the parties' submissions, the court reviews only the most basic facts here and will address the most salient facts and factual disputes in the context of its analysis of the pending motion below. Additionally, CUNA Mutual lately filed a "Notice of Supplemental Rule 30(b)(6) Evidence" without leave of court. (Dkt. #717.) Although untimely, the court has considered this new submission to the extent it is material to the resolution of the pending motions.

Defendant RBS Securities is a Delaware corporation with its headquarters in Stanford, Connecticut.[13]   At one point, RBS was known as "Greenwich Capital Markets, Inc."  RBS served as a securities underwriter for third-party issuers of RMBS in certain transactions; in other transactions, Greenwich Capital purchased full loans for which RBS served as underwriter.   During the period relevant to this case, RBS participated in and structured numerous RMBS transactions, and the parties agree that RBS is highly regarded by at least some entities and individuals.

Beginning in 2004, CUNA Mutual implemented a strategy of investing in a broader range of investment products, though the parties dispute what CUNA Mutual's motivations were for that new strategy.  In September of 2005, CUNA Mutual raised its portfolio yield from 4.89% to 6.13%. At some point in time, it also lowered its General Account Portfolio from AA- to A/A+, in an attempt to increase net investment income.  (*See* Def.'s Reply DPFOF (dkt. #658) ¶ 14 (plaintiff's response).)

Between 2004 and 2007, CUNA Mutual purchased from RBS fifteen different RMBS certificates in ten separate RMBS offerings.   The certificates in these deals were "mezzanine" certificates, meaning they had a lower payment priority and were often subordinated to higher tranches in the overall deal structure.  The specific offerings at issue in this suit include:

- Ameriquest Mortgage Securities, Inc., Asset-Backed Pass-Through Certificates, Series 2004-FR1 ("AMSI 2004-FR1").  CUNA Mutual made an initial commitment to purchase the M3 certificate from this offering on April 2, 2004.

---

[13] This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).

- HarborView Mortgage Loan Trust 2005-15 ("HVMLT 2005-15").  CUNA Mutual made an initial commitment to purchase the B6 certificate from this offering on December 22, 2005.

- Meritage Mortgage Loan Trust 2005-3 ("MMLT 2005-3").  CUNA Mutual made an initial commitment to purchase the B1 certificate from this offering on November 8, 2005.

- RALI Series 2006-Q3 Trust ("RALI 2006-QS3").  CUNA Mutual made an initial commitment to purchase the M3 certificate from this offering on May 26, 2006, and the M2 certificate on October 26 or 27, 2006.

- Renaissance Home Equity Trust 2004-4 ("RAMC 2004-4").  CUNA Mutual made an initial commitment to purchase two certificates of this offering, MF3 and MF9, on November 22, 2004.

- Renaissance Home Equity Trust 2005-4 ("RAMC 2005-4").  CUNA Mutual made an initial commitment to purchase two certificates of this offering, M9 and M10, on December 9, 2005.

- RBSGC Mortgage Loan Trust 2005-A ("RBSGC 2005-A").  CUNA Mutual made an initial commitment to purchase the B2 and B3 certificates from this offering on April 21, 2006.

- RBSGC Mortgage Loan Trust 2007-A ("RBSGC 2007-A").  CUNA Mutual made an initial commitment to purchase the B2 certificate from this offering on March 12, 2007.

- Soundview Home Loan Trust 2005-B ("SVHE 2005-B"). CUNA Mutual made an initial commitment to purchase the M6 certificate from this offering on October 12, 2005, and the M10 certificate on October 14, 2005.

- Soundview Home Loan Trust 2005-OPT4 ("SVHE 2005-OPT4").  CUNA Mutual made an initial commitment to purchase the M8 certificate from this offering on November 3, 2005.

Each one of these RMBS deals had unique structural characteristics and a unique risk profile, and each one was collateralized by unique mortgage loans.

The collateralizing loans were also underwritten by different originators, who apparently utilized their own individual underwriting guidelines.  (*See* Def.'s Reply DPFOF (dkt. #657) ¶ 52; Def.'s Resp. PPFOF (dkt. #658) ¶¶ 205-06, 212, 226-27, 236, 249, 260, 269, 275 (describing originators for each certificate and quoting prospectus language referring to applicable sets of underwriting guidelines).)  As a broad, general proposition, the parties agree that the value of a particular security may be affected by the performance of underlying loan collateral, making the characteristics of those loans potentially relevant to investors.  However, the parties also agree that a given tranche in an RMBS collateralized by subprime loans may *not* be inherently more risky than a tranche in an RMBS collateralized by prime loans.

Each RMBS offering was issued pursuant to registration statements and base prospectuses, containing generalized statements indicating that loans backing the issuers' future RMBS offerings would have been originated in accordance with general underwriting criteria and/or with the criteria more specifically provided in a related prospectus supplement.  (*See* dkt. ##198, 198-1.)  Other offering documents included (1) term sheets,

36

which described the various quantitative characteristics of the loan pools backing the particular RMBS, including the LTV and CLTV ratios and owner-occupancy statistics; (2) prospectus supplements, which contained the disclosures relevant to the particular RMBS offering, including a representation of the loan originators' compliance with the applicable underwriting guidelines; and, in some cases, (3) preliminary prospectus supplements.

Mark Prusha, a Senior Investment Officer/Fixed Income Portfolio Manager at MEMBERS Capital from 1996 to 2005 and a Managing Director/Fixed Income Portfolio Manager at MEMBERS Capital from 2006 to 2009, was solely responsible for making the decision to purchase each of the fifteen certificates at issue.  His primary contact was Mike Carothers, an RBS salesperson.  For each certificate, he conducted pre-purchase analysis and due diligence before making an initial commitment to purchase.  There is no evidence in the record that he conducted any additional analysis after making that commitment.  The date of settlement -- when CUNA Mutual actually paid for the certificates -- generally occurred within a month of the initial commitment to purchase.

For six of the ten offerings (and nine of the fifteen certificates), Prusha actually conducted his due diligence and made his initial commitment to purchase *before* the RMBS were finalized and before RBS completed and delivered the prospectus supplements, meaning that he could not have reviewed those supplements before making the commitment to purchase.[14]  RBS further avers it has searched the documents produced in this litigation, as well as the SEC's EDGAR database, for any *preliminary* prospectus supplements connected with those six deals.  (*See* Kristin Rose Decl. (dkt. #373) ¶ 5.)  With

---

[14] For the other offerings, Prusha theoretically would have had access to the prospectus supplements, although he has no specific memory of actually looking at, much less relying on, them.

the exception of the RAMC 2005-4 deal, Prusha could not locate any preliminary prospectus supplements for these certificates, suggesting that they never existed.  (*Id.* at ¶¶ 6-7.)  Thus, Prusha could not have read preliminary prospectus supplements for five of those six remaining offerings.[15]

The material dates for each of those six offerings and their associated documents are listed in the table below:

| Certificate | Prusha's Due Diligence[16] | Initial Commitment to Purchase | Date of Prospectus Supplement | Date of Settlement | Preliminary Prospectus Supplement |
|---|---|---|---|---|---|
| AMSI 2004-FR1 M3 | March 31-April 2, 2004 | April 2, 2004 | April 8, 2004 | April 14, 2004 | None |
| RAMC 2004-4 MF3 | Nov. 17-22, 2004 | November 22, 2004 | December 23, 2004 | Dec. 29, 2004 | None |
| RAMC 2004-4 MF9 | Nov. 17-22, 2004 | November 22, 2004 | December 23, 2004 | Dec. 29, 2004 | None |
| SVHE 2005-B M6 | Oct. 11-14, 2005 | October 12, 2005 | October 21, 2005 | Oct. 25, 2005 | None |
| SVHE 2005-B M10 | Oct. 11-14, 2005 | October 14, 2005 | October 21, 2005 | Oct. 25, 2005 | None |
| SVHE 2005-OPT4 M8 | Oct. 27-Nov. 3, 2005 | November 2, 2005 | Nov. 22, 2005 | Nov. 30, 2005 | None |
| MMLT 2005-3 B1 | Nov. 3-4, 2005 | November 4, 2005 | Nov. 17, 2005 | Nov. 21, 2005 | None |

---

[15] CUNA Mutual purports to dispute this fact based on a statement from this court that RBS's brief in support of Rule 26(g)(3) discovery sanctions "appears to concede that at least one other preliminary supplement cannot be found in EDGAR despite the fact that it is *known to exist.*"  (*See* Aug. 9, 2013 Opinion & Order (dkt. #245) 31.)  As RBS correctly points out, the court previously misunderstood its argument, as its brief does not appear to make such a concession.  More importantly, now, at summary judgment, CUNA Mutual has offered *no* evidence that preliminary prospectus supplements ever did exist; at best, it has created a "metaphysical doubt" as to their existence, which is not sufficient to withstand RBS's motion for summary judgment.  *Matsushita Elec. Co.,* 475 U.S. at 586.

[16] The dates of Prusha's due diligence are taken from RBS's proposed findings of fact.  RBS, in turn, cites to CUNA Mutual's interrogatory responses to support those dates.  While purporting to contest RBS's assertion that those were the *only* dates during which Prusha analyzed the certificates, CUNA Mutual does not put them into dispute.

| RAMC 2005-4 M9 | Dec. 6-9, 2005 | December 9, 2005 | Dec. 27, 2005 | Dec. 30, 2005 | Dec. 9, 2005 |
|---|---|---|---|---|---|
| RAMC 2005-4 M10 | Dec. 6-9, 2005 | December 9, 2005 | Dec. 27, 2005 | Dec. 30, 2005 | Dec. 9, 2005 |

While Prusha testified that it was part of his "normal" practice for all RMBS deals to review and rely upon final prospectus supplements, he does not recall reading the prospectuses or prospectus supplements for the deals at issue in this case, nor has CUNA Mutual argued that he read or relied upon any of the base prospectuses or shelf registration statements in this case. (*See* Def.'s Reply DPFOF (dkt. #657 ¶ 174.) Additionally, Prusha's files for the ten RMBS deals in this case do not contain prospectuses or prospectus supplements, although the parties dispute whether CUNA Mutual's policy at that time mandated retention of all documents considered in making an RMBS purchase decision. Perhaps most importantly, there is no evidence in the record of any subsequent assurances that Carothers or RBS made to Prusha with respect to the certificates in this case. Indeed, Prusha does not recall *any* specific statements that RBS or its agents made to him in connection with the any of the offerings in this case. (*See* Def.'s Reply DPFOF (dkt. #657) ¶¶ 148-157.) CUNA Mutual does, however, argue that the RMBS market was rife with universal understandings and implicit assumptions upon which Prusha was entitled to rely; the court discusses that theory further below.

Prusha likewise cannot recall any discussions he had with anyone at RBS regarding RBS's due diligence procedures. More specifically, he neither recalls the names of any people with whom he may have spoken, nor can he recall specific conversations or when those conversations may have taken place. (*See id.* at ¶¶ 158-59.) Carothers, Prusha's

39

primary contact, also does not recall anyone asking about RBS's due diligence procedures. Prusha has testified, however, that RBS informed him at some point, whether in conversations or during presentations at conferences, that its employees do "due diligence on every deal they bring to market."  (*See, e.g.*, Def.'s Resp. PPFOF (dkt. #658) ¶¶ 90, 93.) CUNA Mutual likewise points to a presentation RBS purportedly used at the ASF 2007 conference, which Prusha apparently attended and which includes extensive information regarding RBS's general due diligence procedures.  (*See* dkt. #533.)  There is no evidence in the record that Prusha saw, remembers or relied upon this presentation.  CUNA Mutual also cites to other marketing materials from RBS, but again, it does not appear that Prusha remembers ever seeing any of those materials.  (*See* Def.'s Resp. PPFOF (dkt. #658) ¶¶ 98-100.)  Finally, CUNA Mutual identifies testimony from RBS employees stating that they generally used RBS's due diligence as a marketing tool to assure investors that offering documents were accurate, although that testimony does not appear to apply to Prusha or CUNA Mutual in particular.

Some of the documents in question contain statements suggesting (or so RBS contends) that the information therein does not come from RBS itself.  For instance, the prospectus supplements contain disclosures indicating that owner-occupancy status is based on representations from the borrower or mortgagor.  (Def.'s Reply DPFOF (dkt. #657) ¶¶ 177-86.)  The supplements also provide definitions of LTV and CLTV ratios that are similar, though not identical, to one another and indicate that the calculation is based on either appraisals or sales price.  (*Id.* at ¶¶ 190-99.)  And they contain representations, again in varying forms, that "originators" or "mortgage loan sellers" have represented that each underlying loan complies with that originator's underwriting guidelines.  (*See generally id.* at

¶¶ 213-232.)  CUNA Mutual generally agrees that the language RBS quotes appears in the supplements, but hotly disputes the implications of that language in light of the documents' origins and prevailing industry norms.

In contrast, some of the term sheets contain statements suggesting RBS *is* furnishing the information within those sheets to investors.  For ASMI 2004-FR1, SVHE 2005-B, SVHE 2005-OPT4, MMLT 2005-3, HVMLT 2005-15 and RAMC 2004-4, the term sheets state that the information contained therein "is furnished to you solely by Greenwich Capital Markets."  (Def.'s Resp. PPFOF (dkt. #658) ¶ 165.)

As early as 2006 and 2007, CUNA Mutual knew of the poor performance of certain RMBS and suspected that some underwriters might not have made adequate disclosures about their products.  However, there is no evidence in the record that CUNA Mutual had information about *RBS in particular* at that time.   CUNA Mutual filed this suit on December 14, 2011.

### iii.   General Grounds for Summary Judgment

In addition to its more specific arguments for summary judgment on each of CUNA Mutual's remaining misrepresentation claims, RBS advances various grounds for summary judgment that apply with equal force to all claims.   The court briefly addresses those arguments first.

As an initial matter, RBS contends that CUNA Mutual cannot prevail on any of its theories of misrepresentation because it has not presented evidence that the alleged misrepresentations had any practical consequences.  For this proposition, RBS relies on the Wisconsin Court of Appeals' decision in *Tam v. Luk*, 154 Wis. 2d 282, 453 N.W.2d 158

41

(Ct. App. 1990), which held that "a showing of pecuniary loss is not necessary to establish a claim for rescission based on a seller's misrepresentation of the status of the subject property, . . . [but] there must be some showing of prejudice, damage or detriment to the buyer." *Id.* at 288.  While this proposition makes some intuitive sense, CUNA Mutual is correct that Wisconsin's law on rescission arises from the Restatement (Second) of Contracts, *see Notte*, 97 Wis. 2d at 222 (adopting Restatement approach), and the Restatement expressly provides that "the recipient of a misrepresentation need not show that he has actually been harmed by relying on it in order to avoid the contract." Restatement (Second) of Contracts § 164 cmt. c.  In light of the Restatement, it seems more accurate to say that a showing of harm, while not mandatory, is nevertheless an important and sometimes dispositive factor in a court's determination of whether it should exercise its discretion to order rescission given the facts and circumstances of a particular case.  *See Ott v. Peppertree Resort Villas, Inc.*, 2006 WI App 77, ¶ 55, 292 Wis. 2d 173, 716 N.W.2d 127 (Lundsten, P.J., dissenting).

Even assuming a showing of harm is mandatory, a reasonable trier of fact could find on this record that the misrepresentations at issue harmed CUNA Mutual.  CUNA Mutual has offered evidence that Prusha would not have purchased the certificates at issue had RBS not misrepresented their characteristics; and its damages expert has opined that it suffered more than $65 million in damages when those certificates plummeted in value.  CUNA Mutual need not show more to survive summary judgment.[17]

---

[17] RBS argues that CUNA Mutual must prove not merely that it entered into an *unfavorable* transaction because of the misrepresentations but that the transaction was unfavorable *because of* the misrepresentations.  Said another way, RBS essentially contends that the alleged misrepresentations concerning LTV/CLTV ratios and compliance with underwriting guidelines are unrelated to the failure of the RMBS in this case.  The court disagrees.  CUNA Mutual has presented sufficient

Alternatively, RBS contends that a party may only rescind a contract when it lacks an adequate remedy at law, and that CUNA Mutual had various legal remedies under securities statutes or state blue sky laws that it declined to pursue.  For the most part, the authority RBS offers is not directly on point: these cases simply hold that rescission is an "extreme remedy," *Kowalke v. Milwaukee Elec. Ry. & Light Co.*, 103 Wis. 472, 79 N.W. 762, 765 (1899), and is "addressed to the sound discretion of the court," *Mueller v. Michels*, 184 Wis. 324, 199 N.W. 380, 382 (1924).  Still, there is some case law supporting the proposition that an adequate remedy at law weighs against the court's exercise of that discretion.  For instance, in *Hall v. Bell*, 143 Wis. 296, 127 N.W. 968 (1910), the Wisconsin Supreme Court stated that a court of equity ought not to entertain an action for rescission solely due to fraud, since "the party wronged has ordinarily a perfect remedy at law by exercising his legal right to rescind by his own acts, and then suing to recover back what he parted with to his adversary by reason of the latter's fraud."  *Id.* at 968.  In contrast, the court explained, rescission "requires special circumstances . . . rendering the legal remedies not adaptable at all to cure the mischief, or not to adequately do so, to warrant a court of equity in affording its jurisdiction to correct the wrong."  *Id.*

Still, a presumption against the court's exercise of its equitable powers where other rights are adequate is not an appropriate basis for granting summary judgment.  Whether the circumstances of a given case "are or are not sufficient to satisfy the rule, is a matter for determination by the trial court as one of fact."  *Id.*  Thus, while the potential availability of

---

evidence that compliance with underwriting guidelines and LTV/CLTV ratios bear on the risks associated with the underlying loans, and the court could certainly infer as much on this record. Indeed, as noted above, the parties agree, at least as a general proposition, that the characteristics of underlying loans can affect the value of a security.

other remedies may well affect this court's exercise of its discretion in fashioning a remedy here, assuming it finds one to be warranted, it does not appear appropriate to grant RBS summary judgment on these grounds, particularly given the number of disputed facts that remain in this case.

Finally, RBS advances three separate arguments as to time bars to CUNA Mutual's claims. Two of them are closely related to one another: RBS contends that CUNA Mutual has waived its right to pursue claims for rescission, or alternatively that the doctrine of laches bars those claims, because it unreasonably delayed bringing this suit. Wisconsin law states that "[a] party's right to rescind for fraud or mistake is waived if he *unreasonably delays* in asserting that right or affirms the agreement after learning of the fraud or mistake giving rise to the right of rescission." *Thompson v. Vill. of Hales Corners*, 115 Wis. 2d 289, 319, 340 N.W.2d 704 (emphasis added).[18] The doctrine of laches likewise requires "the defense prove that 1) the plaintiff *unreasonably delayed* in bringing the claim, 2) the defense lacked any knowledge that the plaintiff would assert the right on which the suit is based, and 3) the defense is prejudiced by the delay." *Sawyer v. Midelfort*, 227 Wis. 2d 124, 159, 595 N.W.2d 423 (1999) (emphasis added) (citing *Schneider Fuel v. West Allis State Bank*, 70 Wis. 2d 1041, 1053, 236 N.W.2d 266 (1975)). In cases involving the doctrine of laches, "[w]here the facts are undisputed and there is only one reasonable inference, the court may conclude as a matter of law that the elements are met. If the material facts or reasonable

---

[18] Although the *Thompson* case cited above speaks of rescission based on "fraud" or "mistake," a treatise on Wisconsin contract law appears to assume the rule extends to rescission on the grounds of misrepresentation in general. *See* 1 Michael B. Apfeld et al., *Contract Law in Wisconsin*, at § 3.4 (3d ed. 2007). The parties likewise assume that the rule of waiver applies to the reckless, negligent or innocent misrepresentations at issue here.

inferences are disputed, however, summary judgment will be improper." *Id.* (internal citation omitted).

RBS points to the statements of various CUNA Mutual employees as evidence that CUNA Mutual knew of the bases for this lawsuit as early as 2007. For instance, Jack Call, a CUNA Mutual portfolio manager and managing director at the time, sent an e-mail in February of 2007 in which he indicated that "GS," or Goldman Sachs, "perhaps did not make sufficient representations" to CUNA Mutual. He later responded to another e-mail indicating there was the "[p]ossible potential for [lawsuits]." Jeremy Stark, an investment marketing specialist within CUNA Mutual, also sent an e-mail in March of 2007 in which he stated: "We can already hear the distant thunder of a storm of litigation and regulation regarding home loans." That same month, Prusha circulated a Bear Stearns presentation on the "Fallout from Subprime," which he described as a "good picture" of what happened in subprime and Alt-A and which indicated that the weaknesses in the "2006 subprime vintage" were driven by "perverse incentives created by over-capacity and complacency in capital markets allow[ing] risk-layering to reach extreme levels." By August of 2007, Prusha suspected higher levels of borrower and lender fraud for all subprime and Alt-A RMBS. (*See* Def.'s Reply DPFOF (dkt. #657) ¶ 280 (Plaintiffs' Response: "CUNA Mutual admits that Mr. Prusha had this mere suspicion[.]").)

Based on this undisputed evidence, CUNA Mutual undoubtedly knew by 2007 that the RMBS market was collapsing and suspected that at least some originators and underwriters had engaged in misrepresentation or fraud. The problem is that those statements and e-mails, which relate to the market in general or to other underwriters, do not necessarily establish that CUNA Mutual knew it had grounds for a lawsuit *against RBS*

45

at that time.  "[I]t is one thing to know that the securities were not making their expected returns, or had even lost long term value in the eyes of investors, and quite another entirely to have cause to suspect that RBS had materially represented the characteristics of the collateralized loans and its own due diligence." *CMFG Life Ins. Co. v. RBS Sec. Inc.*, No. 12-cv-037-wmc, 2013 WL 4483068, at *4 (W.D. Wis. Aug. 19, 2013).  As this court has already held, generalized claims of abandonment of underwriting standards were not enough to make CUNA Mutual's claims plausible when it had no "specific, concrete examples" with respect to the individual originators in question, further supporting the theory that CUNA Mutual's delay may have been justified by its need to gather specific information. *See id.* at *11.

RBS may well be able to show at trial that CUNA Mutual's delay in bringing this lawsuit was unreasonable; indeed, the facts before the court already permit such an inference.  But the record is not so one-sided as to make that the *only* reasonable inference. Without definitive evidence that CUNA Mutual knew or at least strongly suspected that *RBS* had made misrepresentations justifying rescission of the RMBS at issue in this case, a trier of fact could conclude that CUNA Mutual's delay, while acquiring the information necessary to make its claims against RBS plausible, was reasonable under the circumstances -- particularly because there is at least a dispute of fact as to whether RBS continued to reassure its investors as to the state of the RMBS market.  (*See* Def.'s Resp. PPFOF (dkt. #658) ¶ 617 (conceding that RBS employee sent an e-mail to Prusha in November of 2007 stating, among other things, that "everybody is buying MBS" and "[i]t is all good").)  Thus, the issue of laches is best left for trial.

46

Finally, RBS argues that the six-year statute of limitations for actions in contract, Wis. Stat. § 893.43, bars CUNA Mutual's action to rescind nine of the fifteen certificates at issue.  Recently, in a series of cases parallel to this one, the court concluded that claims for rescission based on negligent or strict responsibility misrepresentations, like those at issue here, are in fact governed by § 893.43.  *See CMFG Life Ins. Co. v. UBS Sec.*, No. 13-cv-576, 2014 WL 2986472 (W.D. Wis. Jul. 2, 2014).  Section 893.43 prescribes a straight six-year limitations period without the benefit of a discovery rule.  CUNA Mutual filed this lawsuit on December 14, 2011.  Thus, § 893.43 would appear to bar CUNA Mutual's claims to rescind the nine RMBS certificates that CUNA Mutual purchased before December 14, 2005.[19]

CUNA Mutual argues that RBS waived the right to invoke Wisconsin's statute of limitations for contracts by agreeing that the applicable statute of limitations for claims in this case sounded in fraud, Wis. Stat. § 893.93(1)(b).  (*See* Def.'s Br. Supp. Mot. Dismiss (dkt. #23) 22; Def.'s Br. Supp. Mot. Dismiss FAC (dkt. #33) 42.)  In fact, it was *RBS* that invoked § 893.93(1)(b) in the first instance, even though CUNA Mutual's claims were for contractual rescission.[20]  As a result, both sides briefed the first motion to dismiss assuming

---

[19] The time-barred certificates include AMSI 2004-FR1 M3, MMLT 2005-3 B1, RAMC 2004-4 MF3 and MF9, RAMC 2005-4 M9 and M10, SVHE 2005-B M6 and M10 and SVHE 2005-OPT4 M8.  The court has used the date of the initial commitment to purchase as the date of contract formation, which is consistent with Prusha's testimony that he did not revisit his decision to purchase following that date.  CUNA Mutual's argument in opposition to the motion to dismiss also assumes that the parties formed their contractual commitment on the date of initial commitment. (*See* Pl.'s Br. Opp'n Mot. Dismiss SAC (dkt. #310) 17.)

[20] The court finds somewhat disingenuous RBS's suggestion that its citation to § 893.93(1)(b) arose from its erroneous belief that CUNA Mutual was bringing a tort claim for strict responsibility misrepresentation.  In fact, on the very page of its brief that RBS cites, RBS states in support of its ultimately-successful argument to strike CUNA Mutual's jury demand that "CUNA asserts two claims: (1) rescission; and (2) unjust enrichment."  (Def.'s Br. Supp. Mot. Dismiss FAC (dkt. #33) 37.)

§ 893.93(1)(b) applied, and the court resolved the motion in the same manner.  It was not until its reply brief on the second motion to dismiss that RBS first brought up the contract statute of limitations, and the application of that statute was not fully briefed until summary judgment.

Nevertheless, "the majority of courts that have considered this issue – that is, whether a party that initially raised an incorrect statute of limitations as a defense should be allowed to raise the correct one at a later stage of the proceedings – have allowed the correct statute of limitations to be raised."  *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 992 F. Supp. 1218, 1227-28 (D. Nev. 1998) (collecting cases), *aff'd in part and rev'd in part*, 216 F.3d 764, 788 (9th Cir. 2000) ("Although it is true that, prior to filing their answers, the defendants had asserted, by way of a motion to dismiss, a statute of limitations defense premised on a mistaken choice of law, the defendants' mistake does not in any way constitute a waiver of all other limitations periods."); *but see U.S. Postal Serv. v. Am. Postal Workers Union, AFL-CIO*, 893 F.2d 1117, 1122 (9th Cir. 1990) ("[T]he APWU did not rely on the six-month limitations period in opposing the USPS' motion for summary judgment.  It relied solely on the California 100-day limitations period . . . .  Accordingly, the six-months limitations period was waived as a defense.").

On the other hand, the court has already recognized that parties are not entitled to "get a free peek" at how their disputes might shake out under a certain standard and ask for reconsideration should they dislike the result.  *Lott*, 556 F.3d at 568.  In this case, these principles seem to collide, and the court must determine whether RBS has waived the right to argue for a different statute of limitations.

The Seventh Circuit recently considered whether a party's failure to raise the correct legal standard until just before trial constituted waiver in *King v. Kramer*, No. 13-2379 (7th Cir. July 10, 2014).  The question in that case was whether the plaintiff was entitled to the benefit of the correct -- but less stringent -- legal standard at trial, even though the parties had assumed for most of the litigation that the more rigorous standard applied, including on summary judgment, on appeal and on remand.  While the Seventh Circuit noted that the "delay in asserting the correct standard was substantial," slip op. at 12, and "[n]o good reason was given" for that delay, *id.*, it nevertheless held that delay alone is insufficient to justify the "extraordinary sanction" of requiring a case to be tried under the incorrect legal standard when all parties become aware of the *correct* one.  *Id.* at 13.  Rather, there must be some showing of significant prejudice or harm to the non-moving party, plus an absence of equities in favor of the movant before a court is justified in proceeding with an incorrect standard.  *Id.* at 18.  Finally, the court noted that the plaintiff was not "guilty of gamesmanship or a last-minute ambush," particularly because plaintiff would have *benefitted* from advancing the correct legal theory earlier in the litigation and had no strategic reason to withhold that information until the eleventh hour.  *Id.* at 19.  Accordingly, the Seventh Circuit directed the court to hold a new trial under the correct legal standard.  *Id.* at 20.

As in *King,* RBS's attorneys should undoubtedly have advanced the correct statute of limitations from the beginning.  RBS was aware from the outset of this lawsuit that CUNA Mutual was bringing a rescission action – CUNA Mutual's original complaint explicitly identifies the cause of action as "Rescission on the Ground of Misrepresentation," as do the later amended versions -- and RBS's attorneys were, at best, careless in invoking the fraud statute of limitations in its initial motion to dismiss.

49

However, RBS's failure to raise the correct (and more favorable) contract statute of limitations earlier on does not mean that CUNA Mutual has suffered "significant prejudice or harm," nor is there evidence that RBS was engaged in gamesmanship by failing to raise the correct standard earlier.  Applying the correct statute of limitations, the fact is CUNA Mutual never had a timely claim for nine of the certificates.  While RBS's delay required the parties to expend time and effort litigating claims that were time-barred, this is the "sort of vague fairness argument," *Tahoe-Sierra*, 992 F. Supp. at 1227, that the Seventh Circuit held insufficient to justify applying the wrong standard in *King*, No. 13-2379, slip op. at 15.  Indeed, the Seventh Circuit has previously denied as "frivolous" an assertion of prejudice based on the moving party's failure to "have [the non-movant's] case dismissed more quickly." *Perry*, 207 F.3d at 383.

The only arguable prejudice CUNA Mutual has suffered is that it may have brought sooner its motion to amend its complaint to add an intentional misrepresentation claim to avoid the bar of § 893.43.  However, for reasons discussed more fully in Section VIII, *infra*, the court is not inclined to credit this argument under the circumstances here.  Even taking RBS's error into account, CUNA Mutual has known of the possible (if not likely) application of § 893.43 since no later than February, when RBS raised it on summary judgment.  CUNA Mutual nevertheless delayed its motion to amend until July 14, undermining its best (indeed, only) claim to prejudice.

Accordingly, the court will grant partial summary judgment based on § 893.43 and dismiss CUNA Mutual's claims for rescission of the nine time-barred certificates in their

entirety.[21]    This leaves CUNA Mutual with potentially timely claims to rescind four certificates -- HVMLT 2005-15 B6; RALI 2006-QS3 M3 and M2; RBSGC 2005-A B2 and B3; and RBSGC 2007-A B2    -- all of which it committed to purchase after December 14, 2005.

### iv.   Elements of Rescission on the Grounds of Misrepresentation

Having addressed RBS's general arguments for summary judgment, the court turns to the specific elements of CUNA Mutual's remaining claim for equitable rescission of contract on the grounds of misrepresentation.  In Wisconsin, a claim for rescission on the grounds of misrepresentation requires CUNA Mutual to prove: (1) RBS made a misrepresentation of fact; (2) the misrepresentation was material or fraudulent; and (3) CUNA Mutual justifiably relied on the misrepresentation.  *See First Nat'l Bank & Trust Co. of Racine v. Notte*, 97 Wis. 2d 207, 222 (1980) (citing Restatement (Second) of Contracts § 301 (Tent. Draft No. 11, 1976)).  CUNA Mutual seeks rescission on the basis of three separate categories of misrepresentations that RBS allegedly made with respect to the RMBS.  For each category, RBS responds that CUNA Mutual has failed to present any evidence with respect to at least one of the three elements it must prove.   The court considers each group of "misrepresentations" separately to determine if CUNA Mutual has presented sufficient evidence to create a genuine dispute of material fact.

### a.  Misrepresentation of Compliance with Underwriting Guidelines

CUNA Mutual claims that its authorized purchaser, Mark Prusha, relied on representations (1) in the prospectus supplements provided with each deal that the loans

---

[21] CUNA Mutual has also moved to amend its complaint to assert intentional misrepresentation so as to avoid the time bar of § 893.43.  The court will address that motion at the end of this opinion.

backing the RMBS complied with originator underwriting guidelines; and (2) on additional assurances from RBS regarding its own "re-underwriting." First, RBS points out that for six of the ten offerings at issue -- ASMI 2004-FR1, MMLT 2005-3, RAMC 2004-4, RAMC 2005-4, SVHE 2005-OPT4 and SVHE 2005-B -- the prospectus supplements were not even available before Prusha made his initial commitment to purchase the RMBS at issue. Thus, Prusha could not possibly have relied on the statements in those supplements in making his purchase decision. For five of the offerings -- all of those mentioned above but the RAMC 2005-4 -- Prusha also could not have relied on a preliminary prospectus supplement, since none apparently exists.[22] *Cf. Pension Committee of Univ. of Montral Pension Plan v. Banc of Am. Secs., LLC*, 592 F. Supp. 2d 608, 629 (S.D.N.Y. 2009); *Dexia SA/NV v. Deutsche Bank AG*, Nos. 11 Civ. 5672(JSR), 11 Civ. 6141(JSR), 2013 WL 98063, at *5 (S.D.N.Y. Jan. 4, 2013). The court has already dismissed CUNA Mutual's claims to rescind these certificates as time-barred; however, in an abundance of caution, the court will also review this alternative ground for summary judgment.

For the ASMI 2004-FR1, MMLT 2005-3, RAMC 2004-4, SVHE 2005-OPT3 and SVHE 2005-B offerings, CUNA Mutual does not dispute that Prusha did not receive the prospectus supplements until after he had performed his own due diligence and made an initial commitment to purchase. As importantly, CUNA Mutual presented no evidence that Prusha performed any further analysis of the RMBS after receiving the documents in question.[23]   Finally, CUNA Mutual offers *no* evidence of any "subsequent personal

---

[22] The RAMC 2005-4 offering and its preliminary prospectus supplement will be discussed in greater detail below.

[23] CUNA Mutual purports to dispute this fact but offers *no* evidence of any additional analysis Prusha performed outside of the dates in question. Indeed, Prusha testified that he did *not* do additional analysis on the deals in question after making the initial commitment to purchase. (*See*

assurances" made by RBS that each RMBS was backed by loans complying with the applicable underwriting guidelines.  (*See* Def.'s Reply DPFOF (dkt. #657) ¶¶ 148-158.)[24]

The only "personal assurances" RBS even arguably gave Prusha or anyone else at CUNA Mutual are those related to due diligence, not those specifically vouching for originators' compliance with their underwriting guidelines.  This court previously credited the theory that RBS was vouching for the accuracy of the original underwriting data by advertising its underwriting procedures to potential buyers.  2013 WL 4483068, at *5.  Thus, if RBS actually told CUNA Mutual that it *had* re-underwritten the loans to ensure they complied with guidelines, that would seem a more compelling claim.  (*See* Def.'s Resp. PPFOF (dkt. #658) ¶ 93.)

For the most part, Prusha's testimony is too vague to allow for the reasonable inference that *any* representations RBS made were material.  He testified, for example, that "They do due diligence on every deal.  I don't know the specifics for this particular deal.  According to their – to what they communicated, they do due diligence, and it varies from

---

Def.'s Reply DPFOF (dkt. #657) ¶¶ 72, 82, 92, 102, 112, 122; *see also id.* at ¶ 147 (citing Nov. 27, 2012 Prusha Dep. Tr. Vol. 1 (dkt. #103) 238:5-10 ("Q: And so again, once you've confirmed the trade and entered it in your system, you don't do anymore analysis about whether to buy that because you've already decided to buy it, right? A: I don't believe there is any post analysis at that point in time, no.").)  That it was Prusha's "regular and normal process" to review and rely upon final prospectus supplements does not create a genuine dispute of fact as to whether he did so in these instances, given that (1) he explicitly testified he did not; and (2) it was not his regular and normal practice to review documents he received *after* making his commitment to purchase.  As previously discussed, such a "metaphysical doubt" as to material facts is not sufficient to place them in genuine dispute.  *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[24] As above, CUNA Mutual purports to dispute these facts, but again it offers no such evidence to raise a genuine dispute.  Indeed, CUNA Mutual's response consists of two assertions: (1) Prusha recalls what is stated in the documents RBS provided to him; and (2) RBS told Prusha it did due diligence on every RMBS deal it brought to market, which includes a re-writing of loans according to the loan originator's underwriting guidelines.  The first assertion, even if true, is irrelevant, because Prusha did not have any documents stating that originators had complied with underwriting guidelines at the time he made his purchase decisions of most of the offerings. The second is discussed above.

deal to deal.  But there is always due diligence done, sampling that's done of the loans."
(Prusha Dep. (dkt. #103) 91:18-23.)   He also testified that he "had due diligence
discussions with different -- various people at RBS, and I knew that they did due diligence
because of our relationship and because of what they told me at these – whether it's
conversations or over the telephone, the due diligence was done on every deal."  (*Id.* at
93:12-17.)

There are a few obvious problems with Prusha's, and CUNA Mutual's, purported
reliance on such general statements.  *First*, most of those statements do not refer to "re-
underwriting" or any other specifics regarding RBS's "due diligence."  *Second*, such vague
representations are essentially "puffery."   Lack of specificity can render a statement
immaterial, such that no reasonable investor could rely on it.  *See, e.g.*, *Searls v. Glasser*, 64
F.3d 1061, 1066 (7th Cir. 1995) (phrase "recession-resistant" was too vague to be
considered "anything but optimistic rhetoric"); *Gammel v. Hewlett-Packard Co.*, 905 F. Supp.
2d 1052, 1070 (C.D. Cal. 2012) ("a statement constitutes inactionable puffery – even if the
maker was aware of its falsity – if the statement is so 'generalized, vague and unspecific' that
no reasonable consumer could rely on it").  Here, general statements that RBS did "due
diligence" on "every deal" strike the court as so generalized and vague that no reasonable
investor could rely on them.  *Cf. ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP
Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (statements regarding "highly
disciplined" risk management "designed to preserve the integrity of the risk management
process" were "no more than 'puffery'"); *City of Austin Police Retirement Sys. v. Kinross Gold
Corp.*, 957 F. Supp. 2d 277, 297 (S.D.N.Y. 2013) ("Kinross's general statements about its
due diligence are fairly characterized as optimistic generalizations, or 'puffery.'").

To be fair, CUNA Mutual does point out a few instances in which the "representations" at issue go into a bit more detail.  For example, RBS apparently made presentations at various conferences during which it described its due diligence procedures in detail.  Those might well extend beyond mere puffery -- but Prusha does not testify he ever saw *any* of those presentations.  And though at one point Prusha testified that RBS said it does due diligence on every deal "which includes a rewunderwriting of loans according to the guidelines of the originator, which includes doing valuation appraisals or appraisals – appraisal review," (Prusha Dep. (dkt. #103) 87:25-88:4), CUNA Mutual fails to present any *specific* evidence as to when, what, where, how, or why anyone from RBS made such a representation to Prusha.  This failure is consistent with Prusha's inability to remember *any* specific statements made to him about due diligence, any person from RBS with whom he spoke or met about due diligence, or any meetings he may have had with RBS during industry conferences.  (*See* Def.'s Reply DPFOF (dkt. #657) ¶¶ 148-63.)  Carothers, Prusha's primary contact, also cannot recall anyone ever asking him about RBS's due diligence procedures.

If anything, CUNA Mutual seems to be retreating from its theory of liability as originally pled in an attempt to keep some claims alive.  Originally, CUNA Mutual alleged that it relied on representations from two sources: (1) the prospectus supplements; and (2) follow-up conversations in which RBS purportedly assured CUNA Mutual that originators had complied with underwriting guidelines.  Now, lacking any such evidence for five of the certificates, CUNA Mutual offers instead nebulous statements from unidentified RBS employees that they "always did due diligence," apparently including re-underwriting.  CUNA Mutual offers *no* evidence as to when these statements were made, who made them

and whether they were made in connection with these offerings, nor does Prusha remember *any* details.   This dearth of evidence undermines CUNA Mutual's new, due-diligence-focused claims of underwriting guideline misrepresentations.   Any pure, "independently-actionable" due diligence claim would fail for the same reasons: Prusha can offer only the vaguest testimony of conversations he believes he had with someone, at some point, at some conference, in which he was informed that RBS "does due diligence" on all of its deals.   This "mere scintilla of evidence" does not suffice to create a genuine dispute of fact.   *Lane v. Hardee's Food Sys., Inc.*, 184 F.3d 705, 707 (7th Cir. 1999) (quoting *Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1471 (7th Cir. 1993)).

This leaves CUNA Mutual with its original theories of liabilities predicated upon misrepresentations (1) contained within the offering documents themselves, and (2) made in follow-up conversations with RBS representatives.   (*See* Aug. 19, 2013 Opinion & Order (dkt. #245) 22.)   For at least these five offerings, however, it now appears Prusha could have relied on *neither* of those sources in making his purchase -- or at least, CUNA Mutual has presented no evidence that he could have, which is fatal at summary judgment.

While CUNA Mutual would somehow salvage this claim by arguing now that Prusha relied on *implicit* representations of originators' compliance with their underwriting guidelines, this paints a picture of a marketplace operating based on general, sweeping assumptions.   *First*, CUNA Mutual contends that originators universally represented that they had originated every loan in an RMBS pool in compliance with their underwriting guidelines.   *Second*, it argues that an underwriter's decision to publicly offer an RMBS to potential investors stood for that same principle of originator compliance (apparently based on things like shelf registrations and base prospectuses).   *Third*, CUNA Mutual indicates

56

that all prospectuses and prospectus supplements included, and all investors knew they included, the same generic disclosures of market customs and standards, including compliance with underwriting guidelines.  Thus, CUNA Mutual essentially argues that it was reasonable to rely upon the mere *existence of each RMBS*, since it would be against industry practice to offer an RMBS backed by loans that did not comply with underwriting guidelines.  It buttresses this argument by contending that it did not have to read the "ubiquitous" representations of underwriting guideline compliance that it knew to be present in each prospectus supplement to rely on those representations.

While this culture of assumption may well have been prevalent in the RMBS market before the mortgage crisis, legally speaking, it cannot rescue CUNA Mutual's claim for reasonable reliance.  CUNA Mutual cites no case in which a court has found a party liable for misrepresentation based on a fact that everyone "knows" (or, more accurately, everyone assumes) to be true, rather than on a defendant's actual, specific misrepresentations.[25]  The

---

[25] At best, this theory seems superficially consistent with rescission on the grounds of mistake, which is generally defined in this context as "a misunderstanding or misconception of the meaning or the implication of something."  1 Michael B. Apfeld et al., *Contract Law in Wisconsin*, at § 3.12 (3d ed. 2007).  The court previously declined to allow CUNA Mutual to amend its complaint to advance this theory, however, and it is no more inclined to do so now at summary judgment.  *See Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002).  In any event, reformation is usually the appropriate remedy in cases of mutual  mistake, so as to express the parties' actual intentions or agreement.  *Newmister v. Carmichael*, 29 Wis. 2d 573, 576-77, 139 N.W.2d 572 (1966).  However, there is no obvious  way to reform the agreement between CUNA Mutual and RBS, which leaves rescission.  Rescission may be an appropriate remedy in cases where reformation is unavailable, but it does not appear that Wisconsin law would support rescission in these circumstances.  In *Wood v. Boynton*, 64 Wis. 265, 25 N.W. 42 (1885), the plaintiff sold the defendant a stone for $1.  Both parties believed it to be a topaz, and neither knew at the time that it was actually a diamond worth $1,000.  The court stated:

> The only reasons we know of for rescinding a sale and revesting the title in the vendor so that he may maintain an action at law for the recovery of the possession against his vendee are (1) that the vendee was guilty of some fraud in procuring a sale to be made to him; (2) that there was a mistake made by the vendor in delivering an article

closest it comes are cases in which a party's silence on a particular fact was deemed a representation of the fact's non-existence. *See, e.g., Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, 283 Wis. 2d 555, 699 N.W.2d 205. Thus, here, RBS's silence with respect to violations of underwriting guidelines would presumably be a representation that there were no such violations. However, that rule would apply only "[w]hen there is a duty to disclose a fact." *Id.* at ¶ 15.

In the context of an arm's-length business transaction, there is generally no duty to disclose.  Such a duty arises only when: (1) the fact is material to the transaction; (2) the party with knowledge knows the other party is about to enter into the transaction under a mistake; (3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (4) the mistaken party would reasonably expect disclosure under the circumstances.  *Id.* at ¶ 20.  As RBS points out, the rule of misrepresentation by silence has been applied only in cases of intentional or fraudulent misrepresentation.  *See Eberts v. Goderstad*, 569 F.3d 757, 765-66 (7th Cir. 2009)

---

> which was not the article sold – a mistake in fact as to the identity of the thing sold with the thing delivered upon the sale.  The last is not in reality a rescission of the sale made, as the thing delivered was not the thing sold, and no title ever passed to the vendee by such delivery.

*Id.* at 44.  Since neither was true in that case, the court refused to rescind the sale.  The court also noted rescission would not have been available if the reverse situation had occurred:

> Suppose the appellant had produced the stone, and said she had been told it was a diamond, and she believed it was, but had no knowledge herself as to its character or value, and [defendant] had given her $500 for it, could he have rescinded the sale if it had turned out to be a topaz or any other stone of very small value?  Could [defendant] have rescinded the sale on the ground of mistake?  Clearly not[.]

*Id.*  Without intentional fraud on RBS's part -- a theory that CUNA Mutual has not pursued in this case -- it does not appear rescission based on mistake would be a viable theory even had the court allowed CUNA Mutual to proceed on those grounds.

("[N]egligent misrepresentation by nondisclosure has not been recognized as a tort in Wisconsin."); *Kaloti*, 2005 WI 111, ¶ 13 n.3 ("We have never held that a claim for strict responsibility for misrepresentation or negligent misrepresentation can arise from a failure to disclose.").[26]

In light of the current state of Wisconsin law, CUNA Mutual falls short in demonstrating that RBS's offerings alone constitute misrepresentations by silence.  The alleged "ubiquity" of compliance with underwriting guideline representations in the RMBS industry and in prospectuses may well be an objective circumstance that makes an expectation of disclosure reasonable under *Kaloti*'s fourth factor.  But that alone does not establish a duty to disclose giving rise to a misrepresentation by silence, at least absent an allegation that RBS actually *knew* of the underwriting guidelines violations and intentionally misrepresented them.  CUNA Mutual's failure to make that argument is consistent with its extensive discussion of the ways in which RBS's due diligence process was flawed or non-existent (suggesting that RBS would *not* have known of the violations of which CUNA Mutual complains) and with this court's earlier determination that the SAC does not assert intentional deception on RBS's part.  (*See* Aug. 19, 2013 Opinion & Order (dkt. #245) 7 n.4, 36-37.)  It is also fatal to any claim of misrepresentation by silence.

---

[26] The other cases CUNA Mutual cites likewise involve intentional misrepresentations and fraud.  *See Hennig v. Ahearn,* 230 Wis. 2d 149, 173, 601 N.W.2d 14 (Ct. App. 1999) ("The evidence is undisputed that Ahearn's alteration of the definition of 'net equity realized' was intentional. . . . Thus, Hennig has established a prima facie claim for intentional misrepresentation.  We express no opinion, however, regarding whether Hennig's claims for strict responsibility and negligent misrepresentation are equally viable on the present record."); *Hlavna v. United Bank*, No. 86-0535, 134 Wis. 2d 454, 397 N.W.2d 157 (Ct. App. 1986) ("The only reasonable inference is that Hlvana (*sic*) must have intended the assertion to induce the bank to do business with him.  Since he knew it did not accord with his actual plans, it was fraudulent.").

To the extent that CUNA Mutual's apparently new "implicit representation" theory is intended to be separate from its theory of "misrepresentation by silence," the court concludes that the only evidence CUNA Mutual offers really bolsters the latter theory and thus cannot carry it through summary judgment. *First,* CUNA Mutual cites to the testimony of its expert Leonard Blum. The cited testimony states that if any of the loans collateralizing the deals did not comply with underwriting guidelines, the RMBS would have been rated "scratch-and-dent," not standard, which RBS should have told CUNA Mutual. (*See* Blum Dep. (dkt. #488) 320:11-321:18.) However, this approach seeks to premise liability on what RBS did *not* say, a theory that the court has already rejected above. *Second,* CUNA Mutual points to the shelf registrations and base prospectuses, which contain general representations that future securities would be backed by loans complying with the applicable underwriting guidelines. Again, however, CUNA Mutual does not argue Prusha *read* the registrations or prospectuses. It simply argues that, based on Prusha's industry knowledge that those sorts of statements *existed*, the absence of any controverting statement constituted a "representation" by RBS. Once again, this is a misrepresentation-by-silence claim, and it fails for the reasons already stated above.

Ultimately, with respect to the ASMI 2004-FR1, MMLT 2005-3, RAMC 2004-4, SCHE 2005-OPT4 and SVHE 2005-B offerings, CUNA Mutual has failed to present any evidence that it actually relied on documents or statements from RBS representing compliance with underwriting guidelines. RBS is, therefore, entitled to summary judgment on the underwriting guideline theory on this alternative basis with regard to those five deals.

The RAMC 2005-4 offering is slightly more complicated, because for that offering, a preliminary prospectus supplement *did* exist, but RBS contends that Prusha could not have

read and relied upon that supplement, arguing that he did not receive it until after making his purchase commitment.  The undisputed facts show that on December 8, 2005, at 11:04 A.M., Mike Warmuth, a CUNA Mutual employee, e-mailed Carothers, stating that CUNA Mutual "can take the 6.7MM of each class."  (*See* Def.'s Reply DPFOF (dkt. #657) ¶ 128.) At 5:30 P.M. that same day, an e-mail containing the preliminary prospectus supplement for the RAMC 2005-4 offering bounced back from Prusha's e-mail account.  (*Id.* at ¶ 129.) At 5:47 P.M., Prusha received a copy of the preliminary prospectus supplement via e-mail. (*See id.* at ¶ 130 ("CUNA Mutual admits that it received a copy of the RAMC 2005-4 preliminary prospectus supplement from Michael McKeever of RBS on December 8, 2005, at 5:47 p.m.").)  At 5:48 P.M., Prusha responded with an automated e-mail stating, "I WILL BE OUT OF THE OFFICE ON THURSDAY, DECEMBER 8TH."  (*Id.* at ¶ 131.)

If this were all the record showed, then RBS might be correct that Prusha could not have reviewed that preliminary prospectus supplement before making his purchase decision. However, the parties agree that Prusha made his initial commitment to purchase RAMC 2005-4 sometime the next day, on December 9, 2005.  (*See id.* at ¶ 123.)  Thus, despite Warmuth's e-mail on December 8 (which does not clearly refer to the RAMC 2005-4 offering in any event), it is possible Prusha could have reviewed the preliminary prospectus supplement before actually making the commitment to purchase.  The court will, therefore, consider RAMC 2005-4 along with the other four offerings remaining -- HVMLT 2005-15, RBSGC 2005-A, RALI 2006-QS3 and RBSGC 2007-A.

Presumably, for these five offerings, Prusha would have had access to the prospectus or prospectus supplement on the date he made the decision to purchase the certificates, meaning he theoretically could have relied upon the statements of compliance with

underwriting guidelines contained therein.[27]   However, CUNA Mutual does not have any

evidence that Prusha actually *did* read those documents.  In fact, during Prusha's deposition,

he testified that he cannot recall whether he reviewed the prospectuses or prospectus

supplements, at a minimum, for HVMLT 2005-15 and RBSGC 2007-A.[28]   (Def.'s Reply

DPFOF (dkt. #657) ¶¶ 136, 145.)   Moreover, CUNA Mutual offers no evidence that

Prusha actually read *any* document in this case.[29]

CUNA Mutual's underwriting compliance-based claims hinge on the one piece of

evidence it does have: Prusha's consistent testimony that it was part of his "standard

procedure" to review prospectuses and prospectus supplements for each RMBS deal.  (*See*

Def.'s Resp. PPFOF (dkt. #658) ¶ 509.)   CUNA Mutual argues this is sufficient to create a

genuine dispute of fact, while RBS disputes that this is the sort of "evidence" from which a

trier of fact could infer actual reliance.  There is case law to support both parties' positions.

*Compare Gould v. Winstar Comm'ns, Inc.*, 692 F.3d 148, 161 (2d Cir. 2012) ("Although

Asher was unable to recall specifically that she reviewed GT's audit opinion letter, there was

evidence that she actively reviewed such letters as a matter of practice in deciding whether

to recommend certain stocks.  At this stage of the proceedings, Asher's testimony is enough;

from that evidence, a jury reasonably could infer that she actually reviewed and relied on

---

[27] As with the offerings discussed above, CUNA Mutual has no evidence of any conversations between Prusha and anyone at RBS with regard to compliance with underwriting guidelines, meaning the documents are the only thing on which Prusha could have relied.

[28] RBS does not identify clear testimony from Prusha with respect to RBSGC 2005-A and RALI 2006-QS3; the citation it offers refers to RBSGC 2007-A.  (*See* Nov. 27, 2012 Prusha Dep. (dkt. #103) 63:18-64:4; Def.'s Reply DPFOF (dkt. #657) ¶¶ 139, 142.)  This is not necessarily fatal to RBS, however, since it is CUNA Mutual's burden to show reliance, not RBS's burden to show *lack* of reliance.

[29] There were also no copies of prospectuses or prospectus supplements in Prusha's deal files for any of the five remaining deals (though the significance of this fact is debatable).  (Def.'s Reply DPFOF (dkt. #657) at ¶¶ 135, 138, 141, 144.)

the relevant statements in the documents."), *with Vervaecke v. Chiles, Heider & Co., Inc.*, 578 F.2d 713, 719 (8th Cir. 1978) (purchaser's statement that it was his "best recollection" that he read the offering statement when he received it did not "create a genuine factual dispute necessitating a trial on the issue of reliance"); *In re Info. Res., Inc. Sec. Litig.*, No. 89 C 3772, 1994 WL 124890, at *6 (N.D. Ill. Apr. 11, 1994) (statement that plaintiff "generally" read documents before making trading decisions did not create a genuine dispute of fact where he could not remember whether he actually read the statements in that case).

Even were Prusha's vague testimony as to his "practice" enough evidence to go forward, the court is further troubled by that testimony having been discredited for fully half the transactions in this case. In those five transactions, Prusha did not even *have* the documents he supposedly read for "every deal" before making the decision to purchase. Assuming for purposes of this opinion that this glaring inconsistency still requires a trial to assess Prusha's credibility, there remains another problem with CUNA Mutual's claim to reasonable reliance on statements in the prospectus: RBS's assertion that the originators, not RBS itself, made the representations at issue. Appendix D of RBS's motion for summary judgment lists each prospectus supplement disclosure with respect to underwriting guidelines. (*See* Br. Supp. Mot. Summ. J. (dkt. #437) 62-64.) Four of those supplements (those pertaining to AMSI 2004-FR1, MMLT 2005-3, RBSGC 2005-A and HVMLT 2005-15) include disclaimers that are the subject of CUNA Mutual's own motion for summary judgment. Leaving the disclaimers aside (since CUNA Mutual has already placed their validity into question),[30] the remaining supplements all include statements to the effect of:

---

[30] In this court's original decision on the motion to dismiss, it indicated that the documents "contain[ed] what appear[] an effective disclaimer," referring to the disclaimers CUNA Mutual now

"The information set forth in the following paragraphs has been provided by the originator." (*Id.*)  RBS relies on these statements to argue that the originators, not RBS, actually made the representations at issue, and that it was simply passing along the information.

In response, CUNA Mutual points out that the offering documents came from RBS, included the RBS logo and were drafted by RBS, which is enough to infer that *RBS* was making the representations at issue.  It also argues that testimony from RBS employees indicating that offering documents "provide information to investors" so they can adequately evaluate whether their potential investments constitute evidence that RBS was essentially making those representations as well.  Finally, CUNA Mutual advances the same due diligence argument that the court has already discussed (and rejected) above.

None of this additional gloss is sufficient to permit a reasonable trier of fact to find that RBS independently made representations that the originators had complied with their underwriting guidelines.  The mere facts that (1) RBS created and sent out offering materials, and (2) those materials "provided information" to investors do not necessarily mean RBS was independently vouching for the truth of representations that were explicitly labeled as coming from originators.

On the other hand, if RBS actually told CUNA Mutual that *it* had re-underwritten the loans to ensure compliance with guidelines, then a reasonable factfinder could conclude that RBS was making those same representations.  (*See* Def.'s Resp. PPFOF (dkt. #658) ¶ 93.)  As noted above, however, CUNA Mutual cannot present any *specific* evidence on this point.  To the contrary, Prusha remembers (1) no particular statements made to him about due diligence, (2) no specific person with whom he spoke or met, and (3) no meetings he

challenges in its own motion.

may have had during RBS industry conferences.  (*See* Def.'s Reply DPFOF (dkt. #657) ¶¶ 148-63.)  In the end, CUNA Mutual is left with the same vague testimony by Prusha as to RBS communicating that it does "due diligence on every deal."  (Prusha Dep. (dkt. #103) 91:18-23, 93:12-17.)  For reasons already discussed, this is not enough to keep CUNA Mutual's claim based on compliance with underwriting guidelines alive, and RBS is entitled to summary judgment on this theory.

### b.  Misrepresentation of LTV/CLTV Ratios

CUNA Mutual also accuses RBS of misrepresenting the LTV and CLTV ratios of the underlying loans based on the systemic inflation of appraisal values.  RBS contends first that the LTV and CLTV ratios do not constitute RBS's own representations.   The prospectus supplements disclose, in language that varies from deal to deal, that LTV and CLTV ratios depend on the lesser of: (1) the appraised value of the mortgaged property; or (2) the sale price of the property.  (Def.'s Reply DPFOF (dkt. #657) ¶¶ 190-199.)  Given this explanatory language, RBS contends that the documents represent *only* that it calculated the LTV and CLTV ratios according to the disclosed formula, *not* that the ratios themselves were accurate.[31]   Presumably, any representation about the ratios' accuracy would come, in RBS's view, from the third-party appraisers.

Since CUNA Mutual lacks any evidence of follow-up conversations between Prusha and anyone at RBS regarding those figures, its opposition depends on the term sheets that contained the LTV and CLTV ratios, which for at least some deals, state that the

---

[31] RBS also states that "the offering materials explicitly noted that LTV and CLTV ratios were provided by third-parties, not RBS."  (Def.'s Br. Supp. Mot. Summ. J. (dkt. #437) 21.)  However, the cited Appendix C merely identifies the portion of each prospectus supplement that discloses how the LTV and CLTV ratio is calculated.  (*See id.* at 60-61.)  In the court's view, this does not amount to an explicit disclosure that the LTV and CLTV ratios are provided by third parties.

information therein "is furnished to you solely by Greenwich Capital Markets, Inc." (Def.'s Resp. PPFOF (dkt. #658) ¶ 165.) Additionally, CUNA Mutual argues that the general evidence of RBS's representations of its due diligence to investors strongly suggests that it independently confirmed the figures at issue, a premise that the court admittedly credited at the motion-to-dismiss stage (albeit in the context of CUNA Mutual's owner-occupancy theory). *See CMFG Life Ins. Co. v. RBS Secs. Inc.*, No. 12-cv-037-wmc, 2013 WL 4483068, at *5 (W.D. Wis. Aug. 19, 2013) ("[T]he natural – and surely a reasonably inferred – message conveyed by RBS, in advertising its underwriting procedures to potential buyers, was that it was vouching for the accuracy of the owner-occupancy data contained in the prospectus and supplements."). Although the court has thoroughly addressed the problems with the due diligence theory above and sees no reason why the result ought to be different here, the argument with respect to the term sheets has some merit. Those which explicitly indicate that the information therein was "furnished . . . solely by" RBS or its earlier incarnation, Greenwich Capital, could certainly support a reasonable inference that any representations therein come from RBS itself.

RBS also argues that there is no evidence the LTV and CLTV ratios were actually false. As for its first point -- that the AVM analysis on which CUNA Mutual relies is irrelevant with respect to purchase-money mortgages – the court has already explained, this does not entitle RBS to summary judgment, since CUNA Mutual claims that systemic overvaluing of properties made the *average* LTV and CLTV ratios too high. Although some of the offerings were apparently made up primarily of purchase-money mortgages, rather than mortgages analyzed using appraisal values, RBS has not argued that any of the certificates were *entirely* backed by purchase-money mortgages or that the proportion of

purchase-money mortgages was so high that it rendered the statistical analysis inadequate. Absent additional detail "demonstrat[ing] the flaws in CUNA Mutual's valuation model" and showing why the purchase-money mortgages invalidate its statistical analysis, RBS is not entitled to summary judgment on this basis. (*See* Aug. 19, 2013 Opinion & Order (dkt. #245) 18.)

Finally, RBS argues that the evidence CUNA Mutual *does* offer to show that the represented LTV and CLTV ratios were false is inadequate. This argument is premised on testimony from Jacqueline Doty, CoreLogic's Rule 30(b)(6) deponent. Doty testified that the CoreLogic AVMs on which CUNA Mutual relied for its statistical analysis should not be used to determine whether an appraiser inflated or deflated a value opinion. Presuming this to be true, however, merely provides a basis on which to attack the reliability of the conclusions stemming from CUNA Mutual's statistical analysis (and thus, the reliability of CUNA Mutual's contention that LTV and CLTV ratios were systemically misrepresented). It does not eliminate the dispute for purposes of summary judgment, and so CUNA Mutual is entitled to proceed to trial on this theory.

### c. Misrepresentation of Owner-Occupancy Data

The last category of misrepresentations RBS allegedly made involves misrepresentations of owner-occupancy data -- that is, the percentage of mortgages in the pool secured by the borrower's primary residence. RBS again argues that the prospectuses and prospectus supplements for each offering state (1) that owner-occupancy data was offered by the borrowers themselves, not by RBS, and (2) that its documents themselves

confirm this.   Furthermore, RBS argues that CUNA Mutual has offered no evidence suggesting that the owner-occupancy data presented in RBS's documents actually *was* false.

The court need not belabor this claim because CUNA Mutual appears to have abandoned it entirely.   (*See, e.g.*, Pl.'s Br. Opp'n Def.'s Mot. Summ. J. (dkt. #568) 1 (describing RBS's misrepresentations as including compliance with underwriting guidelines, adherence to certain LTV and CLTV ratios and performance of due diligence).)   In fact, its brief in opposition does not discuss owner-occupancy data at all.   CUNA Mutual thus leaves unanswered RBS's citations to prospectuses and prospectus supplements, each of which indicates in some fashion that owner-occupancy status is based upon borrowers' representations, admitting that they contain the quoted language in each instance.   (*See* Def.'s Reply DPFOF (dkt. #657) ¶¶ 177-186.)   Nor does CUNA Mutual point the court to any *specific* statements by anyone at RBS that RBS itself stood behind the accuracy of its owner-occupancy data.   Since this was the theory on which this court permitted the owner-occupancy rate claim to go forward at the motion to dismiss stage, an absence of proof is fatal to that claim.[32]   (*See* Aug. 19 Opinion & Order (dkt. #245) 12.)

Even more important, however, CUNA Mutual presents *no* evidence that the owner-occupancy data in RBS's offering documents was actually false.[33]   In response to RBS's proposed finding of fact, CUNA Mutual cites only to Paragraph 80 and Exhibit E of the Holt Report.   Paragraph 80 indicates that Ira Holt, in re-underwriting a sample of loans,

---

[32] In purporting to dispute this proposed finding of fact, CUNA Mutual points to Prusha's deposition, in which he testified that he regularly relied on general "information" RBS gave him in making his purchase decisions.   Given the other fatal flaw in CUNA Mutual's opposition, the court need not decide if this is sufficient to survive summary judgment but it is highly questionable whether this vague testimony, without anything more, would permit a reasonable trier of fact to find in CUNA Mutual's favor.

[33] A misrepresentation by its terms must be false: the Wisconsin Supreme Court has defined it as "an assertion that does not accord with facts as they exist."   *Notte*, 97 Wis. 2d at 222.

"evaluated claims of occupancy for possible misrepresentation" when considering whether the originators violated their own guidelines.  (*See* Ira Holt Report (dkt. #354) ¶ 80.)  This sheds no light on whether the data RBS provided with respect to owner-occupancy rates was actually inaccurate (nor does Exhibit E, which is a copy of the survey Holt apparently used to acquire information with respect to individual loans and borrowers).

In the end, when challenged directly by RBS to provide some evidence that RBS misrepresented owner-occupancy rates, CUNA Mutual failed to do so.  Failure to respond to an opponent's argument results in waiver.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010); *Brach v. City of Wausau*, 617 F. Supp. 2d 796, 806 (W.D. Wis. 2009) (noting that "failure to meaningfully oppose an argument operates as a waiver").  Neither is it this court's responsibility to "scour the record looking for factual disputes" on CUNA Mutual's behalf, *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994), nor to "scour the party's various submissions to piece together appropriate arguments." *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).  Because CUNA Mutual has failed to point the court to any evidence that the owner-occupancy ratios in RBS's offering documents were incorrect, no reasonable trier of fact could find in its favor on this issue, and RBS is entitled to summary judgment.

### B.  CUNA Mutual's Motion for Summary Judgment

CUNA Mutual has moved for partial summary judgment to declare the disclaimers in four of the prospectus supplements void.  The prospectus supplements relate to CUNA Mutual's claims for misrepresentations of compliance with underwriting guidelines, however, and those claims are no longer part of this case.  The term sheets, which included

quantitative characteristics like the LTV and CLTV ratios, do not have any such disclaimers -- or at least, CUNA Mutual has not challenged them on that basis.  Thus, CUNA Mutual's motion is denied as moot.

## VI.   Motion to Strike the Reports of Holt and Sabry

RBS has also moved to strike the expert report of CUNA Mutual's re-underwriting expert, Ira Holt.  (Dkt. #337.)  To the extent this court understands Holt's opinions, they are intended to support CUNA Mutual's theory of non-compliance with underwriting guidelines, focuses on his procedure for re-underwriting a sample of the loans backing each RMBS certificate and the results of that procedure.  Given this court's decision on summary judgment dismissing all claims related to compliance with underwriting guidelines, the motion to strike Holt's report appears to be moot.

Likewise, CUNA Mutual has moved to strike the expert report of Faten Sabry.  (Dkt. #630.)   The purported excuse for that otherwise untimely report was to rebut certain statements Holt made in his own expert.  Since it does not appear to the court that there is any remaining basis for CUNA Mutual to offer the Holt Report at trial, the Sabry Report would similarly be irrelevant, mooting that motion to strike as well.  To the extent that the parties wish to argue the relevance of the Holt and/or Sabry Reports with respect to CUNA Mutual's remaining claims for rescission based on misrepresentation of LTV and CLTV ratios, they are free to do so in advance of trial.

## VII.   Motion for Sanctions Based on Late Production

CUNA Mutual recently moved to impose severe sanctions on RBS for a late production of more than 37,000 pages of documents that it alleges are "relevant to core

issues in this case." (Dkt. #713.)  In its response, RBS represents that the vast majority of that production is comprised of send receipts for blast e-mails that CUNA Mutual has had all along and, indeed, has already produced *to RBS*; that another 10,000 pages are recent deposition transcripts from other cases that CUNA Mutual requested; and that its most recent production was made "out of an abundance of caution" and has little bearing on CUNA Mutual's case.

Given the lack of specifics in CUNA Mutual's motion for sanctions, the court will credit for the time being RBS's assertion that its late production is harmless -- the more so because the specific document on which CUNA Mutual focuses, a copy of the Meritage underwriting guidelines, was relevant to its claims for misrepresentation of compliance with underwriting guidelines but would not have had any effect on this court's determination on summary judgment.  Thus, its motion for sanctions is denied.  The court will, however, give CUNA Mutual an opportunity to counter RBS's assertions of harmlessness now that it has had additional time to sort through the late production.  Should CUNA Mutual discover additional late-produced documents important to its remaining claims in this case, it is free to renew its motion for sanctions, proffer the particular documents to the court and explain their relevance.

## VIII.  Motion to Amend the Complaint

Following this court's ruling in the *UBS Securities* case, CUNA Mutual also moved to amend its complaint "by interlineation," so as to allege fraud explicitly and avoid the statute of limitations bar of § 893.43.  CUNA Mutual purports to file this motion out of an abundance of caution, to bolster fraud claims that were already part of the case, and so in

CUNA Mutual's view, RBS cannot reasonably claim it has suffered any prejudice.  RBS responds that CUNA Mutual has expressly disavowed a fraud claim from the outset and cannot now, two weeks before trial, fundamentally alter the nature of its claims.

The court agrees with RBS that the interests of justice do not favor allowing amendment here.  Under the heading "The nature of CUNA Mutual's claims," CUNA Mutual's Second Amended Complaint states that "CUNA Mutual is not specifically alleging that RBS committed fraud."  (SAC (dkt. #257) ¶ 182.)  The complaint goes on to say that while "likely" that RBS "knew or suspected" the representations were false, they were "actionable even if negligently or innocently made."  (*Id.*)  The one specific allegation of intent -- that "RBS's due diligence process was deeply flawed and either intentionally or recklessly allowed Materially Defective loans into the loan pool" -- appears only in the context of CUNA Mutual's previously dismissed claim for unjust enrichment.  (*Id.* at ¶ 895.)  Moreover, the court noted at the time of dismissal that this particular allegation of intent "can be disregarded," since it was part of a claim that the court dismissed and that CUNA Mutual did not successfully revive.  (Aug. 19, 2013 Opinion & Order (dkt. #245) 36-37.)

Although CUNA Mutual argues that it acted with reasonable diligence in seeking leave to amend, the court disagrees.  RBS first asserted that CUNA Mutual's remaining claims were barred by the correct statute of limitations in December of 2013, in its reply brief on the second motion to dismiss.  (*See* Def.'s Reply (dkt. #319) 17.)  While arguments raised in a reply for the first time are generally considered waived, at the very least CUNA Mutual was on notice of a potential problem with its suit as pled.  RBS then raised the same contract statute of limitations argument as part of its summary judgment argument in

February of 2014 -- more than five months ago. CUNA Mutual had an opportunity to respond, and did so in its brief in opposition, but chose not to seek leave at that time to amend its complaint to bring claims for rescission based on fraudulent misrepresentations -- whether because it had no "strategic reason" to do so or because it knew it could not prove its case. Even when the court ruled in *UBS Securities* on July 2, 2014 that the contract statute of limitations applies to claims like those alleged here, CUNA Mutual waited almost two more weeks before filing its motion to amend on July 14.

While the court may well have found diligence had CUNA Mutual moved to amend in December of 2013, and might also have found diligence had it moved to amend in February of 2014, the additional delay of five months is simply too long a delay and highly prejudicial. *First*, allowing amendment now *would* alter the legal theory of this case, CUNA Mutual's assurances to the contrary notwithstanding. CUNA Mutual itself recognizes that it initially had no "strategic reason" to plead fraud expressly, because Wisconsin law theoretically permits rescission based on negligent or strict responsibility misrepresentation, so long as that misrepresentation is *material*. The parties have, therefore, litigated this case as though RBS's intent was irrelevant. Now, mere weeks before trial, CUNA Mutual would abandon that theory with respect to nine of the fifteen certificates and seek to prove instead that RBS not only knew its representations were false, but made those representations intending to defraud CUNA Mutual.

"There must be a point at which a plaintiff makes a commitment to the theory of its case." *Johnson v. Methodist Med. Ctr. of Ill.*, 10 F.3d 1300, 1304 (7th Cir. 1993). The court believes that time is past. Until now, CUNA Mutual has remained committed to the theory that RBS's representations were material, and thus actionable, regardless of RBS's intent.

73

Allowing an amendment now would not only require the court to move the trial date; it would also need to reopen discovery and, after adequate time has passed, permit RBS to bring a motion for summary judgment predicated on the fraud-based claims.[34]

*Second*, while delay alone is ordinarily insufficient to justfiy denying leave to amend, *Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 793 (7th Cir. 2004), the court has no difficulty crediting RBS's claims of prejudice. Believing that its intent was not at issue, RBS has proceeded to litigate this case based on other grounds. To allow CUNA Mutual to abandon the need to prove materiality, in favor of proving knowledge and intent to defraud, would either substantially alter the course of trial or effectively deny RBS the opportunity (and certainly the reason) to take discovery on an intent-based theory and/or attack CUNA Mutual's purported fraud claims at summary judgment.

This is not a case like *King v. Kramer*, No. 13-2379 (7th Cir. July 10, 2014), where all parties recognized late in the game that they had been applying the incorrect standard, and where plaintiff had no strategic purpose in withholding that information. Here, CUNA Mutual deliberately chose a viable theory of rescission based on material misrepresentations, which were actionable no matter RBS's intent, but suddenly seeks to bring an alternative

---

[34] Even if allowed to proceed, there is a real question as to whether CUNA Mutual *did* allege enough facts in its Second Amended Complaint to support a claim of fraud. Disregarding its statement that it was *not* specifically alleging fraud, as the motion to amend requests, the most troubling of the facts CUNA Mutual alleges is that RBS internally referred to RBSGC 2005-A as the "Challenger Shuttle" and a "bad deal" while continuing to represent it as "attractive" to CUNA Mutual. But RBSGC 2005-A is not one of the time-barred securities and is going forward even under the contract statute of limitations. The other facts that support an inference of RBS's knowledge -- for instance, that RBS hired a third-party underwriter who ultimately revealed defects in many of the loans -- go to its claim of misrepresentations of underwriting guideline compliance. As described in Section V.A.iv.a, *supra*, those claims fail due to a lack of evidence of CUNA Mutual's reliance on any particular representations. Likewise, the allegation that RBS intentionally limited its re-underwriting goes to its due diligence claims, which also fail for lack of evidence.

theory to evade a statute of limitations it has known about for at least five months.  This is too dramatic a change at too late an hour.

## CONCLUSION

In light of this decision, the court trial set for August 4, 2014, will solely address CUNA Mutual's claims for rescission predicated on RBS's alleged misrepresentation of LTV and CLTV ratios.  The court will hold a telephonic status conference on Tuesday, July 29, 2014, at 2:00 p.m. to address further specifics as to which certificates remain in the case. The parties are encouraged to confer beforehand.

## ORDER

IT IS ORDERED that:

1) Defendant RBS Securities' Motion for Clarification (dkt. #266) is DENIED.

2) Plaintiff CUNA Mutual's Motion to Vacate Sanctions Against CUNA Mutual and Assess Sanctions Against RBS (dkt. #287) is DENIED.

3) Defendant's Motion to Dismiss (dkt. #296) is DENIED.

4) The parties' Motions for Judicial Notice (dkt. ##298, 314) are DENIED AS MOOT.

5) Defendant's Motion to File a Supplemental Declaration (dkt. #308) is DENIED as moot.

6) Defendant's Motion for a Hearing (dkt. #317) is DENIED as moot.

7) Defendant's Motion to Strike Ira Holt's Expert Report (dkt. #337) is DENIED as moot.

8) Defendant's Motion for Summary Judgment (dkt. #343) is GRANTED IN PART AND DENIED IN PART, consistent with the opinion above.

9) Defendant's Motion to Exclude the Valuation Opinions of Dr. Charles Cowan (dkt. #379) is DENIED.

10)     Plaintiff's Motion for Partial Summary Judgment (dkt. #381) is DENIED as moot.

11)     Plaintiff's Motion to Strike the Expert Report of Faten Sabry (dkt. #630) is DENIED as moot.

12)     Plaintiff's Motion for Sanctions (dkt. #713) is DENIED without prejudice as to later reconsideration.

13)     Plaintiff's Motion to Amend the Complaint (dkt. #727) is DENIED.

14)     A telephonic status conference will be held on Tuesday, July 29, 2014, at 2:00 p.m. to address further specifics as to which certificates remain in the case, plaintiff to initiate the conference call.

Entered this 23rd day of July, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge